**20TH CENTURY MANUFACTURING COMPANY**

v.

**The UNITED STATES.**

No. 223–68.

United States Court of Claims.
July 14, 1971.

**1110**

George A. Hrdlicka, Houston, Tex., for plaintiff, Robert I. White, Houston, Tex., attorney of record. Chamberlain & Hrdlicka, Robert L. Waters, Houston, Tex., of counsel.

David J. Gullen, Washington, D. C., with whom was Asst. Atty. Gen., Johnnie M. Walters, for defendant, Philip R. Miller, Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, C. J., and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, JJ.

## OPINION

DURFEE, Judge, delivered the opinion of the court.*

Plaintiff, a Texas corporation, is engaged in the manufacture and sale, both at retail and at wholesale, of items known as travel trailers, chassis-mount cab-over campers, slide-in cab-over campers, slide-in sleeper campers, and camper covers.[1] We focus on plaintiff's

---

* We are indebted to Commissioner Mastin G. White for his findings of fact which we adopt with some modifications, and for his opinion, which has been very helpful, and which we use in part, although we reach a different result.

1. See Findings 4 and 5 for detailed descriptions of each unit manufactured by plaintiff.

camper covers, described in detail below, which are smaller, less complex in design, and less expensive than plaintiff's other units. The issue is clear. We must decide whether plaintiff's camper covers are subject to manufacturer's excise tax.

During the period October 1, 1964—September 30, 1967, plaintiff did not file manufacturer's excise tax returns with respect to the manufacture of these covers. At various times, the Internal Revenue Service assessed against plaintiff manufacturer's excise taxes and penalties in the amount of $7,282.31, plus interest in the amount of $935.55, or a total amount of $8,217.86. According to defendant, plaintiff has previously made payments of $270.92,[2] leaving a balance due of $7,946.94, plus interest. In January 1968, plaintiff filed claims for refund with the Internal Revenue Service.[3] The administrative agency having failed to take any action on plaintiff's claims within a period of six months after the filing of such claims, plaintiff filed the present court action on August 2, 1968.[4] Defendant has asserted a counterclaim against plaintiff in the amount of $7,946.94.

During the period with which the court is concerned, plaintiff manufactured two types of camper covers, one with a horizontal door and the other with a vertical door. Approximately 80 to 85 percent of the covers manufactured and sold by plaintiff were equipped with horizontal doors.

The camper cover with a vertical door had two sides, a front, a back, and a roof. It was designed so that the sides and front of the unit could be mounted or set on the sides and front of the pickup truck, extending upward 30 or 36 inches therefrom, and so that the back of the unit would extend downward from the

roof of the unit to the floor of the truck bed, from which the tailgate had been removed. Thus, the camper cover had the same length and width as, and covered, the bed of a pickup truck. The sides of the camper cover were bolted at the bottom to the sides of the truck bed at the top. It was sealed to the truck bed, along the sides and the front, with a calking type of putty. The unit had a wooden frame which was covered on the outside with sheet aluminum. The interior was insulated, finished with wood paneling, and had 12-volt wiring for electric lights. The unit had screened windows of the jalousie type on both sides, a screened roof vent, and a screened entrance door in the back, which could be locked. The combination of a truck bed and an installed camper cover provided approximately 234 cubic feet of space on the inside. Plaintiff sold this type of camper cover for approximately $235 during the period that is involved in the present litigation.

The camper cover with a horizontal door was identical with the other camper cover, except that it had a height of only 30 inches before being mounted on a truck and it was designed to be used with a pickup truck which was still equipped with a tailgate. This unit had a lift-up type of horizontal door above the tailgate of the truck, instead of a vertical door that extended upward from the floor of the truck bed. The horizontal door and the tailgate fitted together when both were closed, and they could be locked in that position for the purpose of security.

When a camper cover with a height of 30 inches was placed on the bed of a pickup truck, the overall height of the enclosed interior (i. e., from the floor of the truck bed to the roof of the

2. The petition alleged that the amounts paid by plaintiff totaled $69.42, but defendant conceded in its first amended answer that plaintiff's payments aggregated $270.92.

3. The claims aggregated $69.42 and plaintiff asked for statutory interest in addition.

4. In the petition, plaintiff asked for a judgment against defendant "in the amount of $69.42, or whatever amount to which it is entitled in law and fact, together with interest thereon according to law * * *."

camper cover) ranged from 47 to 52 inches. With a 36-inch camper cover in place, the overall height of the enclosed interior ranged from 53 to 58 inches.

■ Section 4061(b) (1) of the Internal Revenue Code of 1954, as amended, imposed the manufacturer's excise tax upon, *inter alia*, "parts or accessories" of automobile truck bodies. We must first determine, therefore, whether plaintiff's camper covers are "parts or accessories" within the meaning of the statute. Treasury Regulations on Manufacturers and Retailers Excise Tax (1954 Code), Section 48.4061(b)–2 provides in part:

> *Definition of parts or accessories.*— (a) *In general.* The term "parts or accessories" includes (1) any article the primary use of which is to improve, repair, replace, or serve as a component part of an automobile truck or bus chassis or body, or other automobile chassis or body, or taxable tractor, (2) any article designed to be attached to or used in connection with such chassis, body, or tractor to add to its utility or ornamentation, and (3) any article the primary use of which is in connection with such chassis, body, or tractor, whether or not essential to its operation or use. \* \* An article shall not be deemed to be a taxable part or accessory, even though it is designed to be attached to the vehicle or to be primarily used in connection therewith if the article is in effect the load being transported and the primary function of the article is to serve a purpose unrelated to the vehicle as such. \* \* \*

The principle of this Regulation was upheld by the Supreme Court in Universal Battery Co. v. United States, 281 U.S. 580, 50 S.Ct. 422, 74 L.Ed. 1051 (1930), and for reasons which follow, we are convinced that plaintiff's camper covers fall within its meaning.

Plaintiff's units were uniquely designed to be functional only after being mounted on the bed of a pickup truck. When attached to the pickup truck, the cover, in conjunction with the bed, sides, and in most cases, the tailgate of the truck body, formed a large, enclosed, weatherproof, and relatively theftproof area which was suitable for multiple purposes. The addition of the cover substantially improved the utility of the vehicle by increasing the number of functions the pickup truck could perform. Thus, the unit became a component part of the truck body, although not essential to the truck's actual operation or use. For the reason that the unit has no functional value detached from the truck body, we find that the camper cover was designed to be attached to and used in connection with an automobile truck body.

The instant case presents precisely the reverse situation as that which confronted the District Court in King Trailer Co. v. United States, 228 F.Supp. 1013 (S.D.Cal.1964), aff'd, 350 F.2d 947 (9th Cir. 1965). In *King Trailer*, the court held that the pickup coaches under consideration were not "parts or accessories" within the meaning of the statute and the appropriate Treasury Regulation.[5] As the basis for its holding, the court emphasized that, although the coach was designed to be transported in the bed of a pickup truck, it performed its function independently of the truck body:

> \* \* \* Although each coach is designed to be carried on such motor vehicles it does not truly complement the vehicle's own function or ornament it. \* \* \* Of even more import is the fact that it does not depend on the

---

5. Each pickup coach, which was the subject of litigation in *King Trailer*, was a self-contained unit, having insulated walls, a roof, and a floor of its own, as well as a window and door. It was not designed to use the sides and the bed of a pickup truck as part of the interior of the completed unit. The pickup coaches more closely resembled plaintiff's slide-in sleeper camper or slide-in cab-over camper, as described in Finding 4.

motor vehicle to perform its major function as a residence. * * * The coach's primary purpose is to provide a residence * * * for its owners. It performs this function equally well when it is off the pickup truck. It doesn't need the aid of any part of the vehicle to perform its function as a residence * * *. (*King Trailer Co., supra*, at 1020).

For these reasons, we find that plaintiff's camper covers are "parts or accessories" of automobile truck bodies within the terms of Section 4061 of the Code.

■ Having held that plaintiff's camper covers are "parts or accessories" for excise tax purposes, we must now determine whether plaintiff's covers are, nevertheless, exempt from manufacturer's excise tax by virtue of Section 4063 of the Code (as amended June 21, 1965 by Section 801(a), Excise Tax Reduction Act of 1965, 79 Stat. 136), which provides in part:

(a) *Special Articles.*

(1) *Camper coaches; bodies for self-propelled mobile homes.*—The tax imposed under section 4061 shall not apply in the case of articles designed (A) to be mounted or placed on automobile trucks, automobile truck chassis, or automobile chassis, and (B) to be used primarily as living quarters.

There is no dispute that plaintiff's units were designed to be mounted or placed on the bed of a pickup truck. Thus, the only question which remains to be decided is whether plaintiff's units were, in the words of the statute, "designed

* * * to be used primarily as living quarters." The word "primarily" has been defined by the Supreme Court in Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966). as "of first importance" or "principally." [6]

In order to approach this question with the proper perspective, and in order to clarify the positions assumed by the opposing parties to this action, it will be helpful to briefly review the legislative, judicial and administrative history of the manufacturer's excise tax on automobiles and trucks, and their parts or accessories. We take special notice, of course, of the "house-trailer" exemption and its subsequent applicability to less complex recreational vehicles.

The Revenue Act of 1918, c. 18, 40 Stat. 1057, imposed excise taxes on automobiles and trucks, as well as on parts or accessories thereon. It was not until 1951 that the "house-trailer" exemption [7] to the excise tax on automotive chassis and bodies first surfaced as part of the Revenue Act of 1951, c. 521, 65 Stat. 452. In 1953, the Internal Revenue Service ruled that small one- and two-wheel "camp trailers" containing poles and canvas to permit the erection of a campsite tent were to be considered house trailers and thereby exempt. Rev.Rul. 100, 1953–1 Cum.Bull. 461. In 1955, the Chief of the United States Treasury Department's Excise Tax Branch issued a private ruling to the King Trailer Co. which specifically exempted from manufacturer's excise tax pickup coaches and sport-top bodies. [8]

The Internal Revenue Service's liberal interpretation and application of the house trailer exemption to smaller and

---

6. In Malat v. Riddell, the Court was construing § 1221(1) of the IRC of 1954, which denied a taxpayer capital gain treatment for profits reaped from the sale of "property held by the taxpayer *primarily* for sale to customers in the ordinary course of his trade or business." [Emphasis supplied.]

7. The primary purpose for the original house trailer exemption was expressed in S.Rep.No.781, 82nd Cong., 1st Sess. 98 (1951) as follows:

"Your committee's bill removes the tax on house trailers because it recognizes that, during periods of emergency such as the present, the bulk of these house trailers are used for housing by defense workers, military personnel and others rather than as a means of transportation." U.S.Code Cong. & Admin.News, p. 2073.

8. Sport-top bodies are essentially the same in design and construction as plaintiff's camper covers.

less complex recreational vehicles narrowed considerably in 1958. In that year, the Service issued Rev.Rul. 58–487, 1958–2 Cum.Bull. 763, wherein it was concluded that a self-propelled mobile home (motor home) was subject to the manufacturer's excise tax as a body or chassis of either a truck or automobile. On April 1, 1960, Rev.Rul. 60–39, 1960–1 Cum.Bull. 406 substantially reversed the previously expressed position of the IRS with regard to the taxability of units commonly known as campers and camper covers. In particular, that ruling subjected three separate units to excise tax:

> *Situation (1).* A company manufactures and sells a body which is similar in appearance to a house trailer body but which is designed to be mounted on a pickup automobile truck. It is constructed so that it may be secured to the truck frame by four bolts but it can be easily dismounted. It has windows and a door is sold equipped with living and sleeping accommodations consisting of a stove, refrigerator, sink, bed, dinette seats, table, cupboard, and sideboard.

> *Situation (2).* A company manufactures and sells a so-called "slide-in cabin" which is designed to be placed in the body of a pickup automobile truck. The cabin has a floor, a door and windows. It is described as being waterproof and dustproof. It is used for temporary living and sleeping quarters and, generally, is sold equipped with an ice box, stove, light, cabinet, shelf, and two mattresses. When it is not in use on the truck, it may be placed on the ground, for use as a guest cottage or as a playhouse for children.

> *Situation (3).* A company manufactures and sells a one-piece top which is designed to be mounted on the body of a pickup automobile truck. The top is constructed so that it may be attached to the truck body sides by four bolts. When it is installed, the top, together with the truck body sides and the truck floor, provides a waterproof and theftproof area which can be used for sleeping quarters. It has windows and a rear door and can be equipped with swing-up bunks, mattresses, and a dome light.

The units described in situations (1) and (2) were held to be taxable as truck bodies or chassis, and the unit described in situation (3), which closely resembles plaintiff's camper cover, was held to be taxable as a truck part or accessory.

In 1964, Rev.Rul. 58–487 was challenged in Frank Motor Homes, Inc. v. United States, 230 F.Supp. 782 (E.D. Mich.1964), aff'd, 354 F.2d 660 (6th Cir. 1965),[9] and Rev.Rul. 60–39, as it applied to the units described in situations (1) and (2), was challenged in *King Trailer Co., supra.*[10] In both instances, the taxpayer was successful and the units in issue were held to be exempt from manufacturer's excise tax. The practical effect of these two judicial holdings was the legislative enactment of § 4063(a)(1), which is quoted above and is the subject of our present deliberations, as part of the Excise Tax Reduction Act of 1965, Pub.L. No. 89–44, § 801, 79 Stat. 136.

It is plaintiff's contention that the phrase "designed * * * to be used primarily as living quarters" is applicable to and clearly exempts its camper covers from manufacturer's excise tax. It is defendant's contrary contention that

9. In *Frank Motor Homes,* the court held that bodies for self-propelled motor homes fell within the house trailer exemption of Section 4063(a) of the Code and were, consequently, not subject to excise tax.

10. In *King Trailer Co.,* the court held that pickup coaches, which were similar in design to house trailers, and which were primarily designed to be transported in the bed of a pickup truck, were not "automobile truck bodies" or "automobile accessories" within the motor vehicle excise tax statute.

§ 4063(a) (1) was intended to codify *Frank Motor Homes* and *King Trailer*, which were limited to motor homes and the camper units described in situations (1) and (2) of Rev.Rul. 60–39.

Thereafter, in Rev.Rul. 66–163, 1966–1 Cum.Bull. 252, the IRS recognized the applicability and precedent value of the *King Trailer* decision with respect to situations (1) and (2) campers. However, in a separate ruling it was held that situation (3) camper covers did not fall within the exemption from tax provided by § 4063(a) (1) of the Code. Rev.Rul. 67–232, 1967–2 Cum.Bull. 365. This ruling, superseding Rev.Rul. 60–39, as modified, stated in pertinent part:

> For purposes of the * * * exemption with respect to camper coaches * * * an article must be complete in itself and cannot depend on the body of a pickup truck for that completeness. To come within the exemption for camper coaches the article must be able to function as living quarters as well off the truck as it does mounted on the truck.

This brief history could not be complete without mention of Section 303 of the Excise, Estate and Gift Tax Adjustment Act of 1970, enacted effective January 1, 1971, which positively ended any future application of the § 4061 manufacturer's excise tax to camper covers. This act extends the present exemption for camper coaches to those articles which are "designed * * * to be used primarily as living quarters or *camping accommodations.*" [Emphasis supplied.] The language of the report accompany-ing the bill leaves no doubt that camper covers of the type produced by plaintiff were to be specifically included within the terms of this newly revised exemption.[11] Thus, we are concerned, in the instant case, with plaintiff's camper covers which were produced before December 31, 1970.

We hold, for reasons which shall become apparent, that plaintiff's camper covers were "designed * * * to be used primarily as living quarters" within the terms of the § 4063(a) (1) exemption. Accordingly, said covers are not subject to the manufacturer's excise tax imposed by § 4061.

The testimony of plaintiff's designer and plaintiff's vice-president and chief investor was to the effect that these units were placed on the market because of a belief on the part of plaintiff's management that a demand existed: (1) for an inexpensive unit to be used on short hunting, fishing or camping trips for the purpose of providing shelter and temporary sleeping quarters, as well as for storing, transporting and protecting the recreational equipment used in conjunction with such outings; and (2) for a unit with a relatively low silhouette, which would not be affected unduly by front or side winds, which could be taken off the road in remote hunting or fishing areas with more facility than would be true of a larger unit, and which could be parked in a carport or garage when not in use. Although we do not, for obvious reasons, accept the designer's subjective testimony as conclusive, we do note that it is consistent with and cor-

11. S.Rep.No.91–1444, 91st Cong., 2d Sess., 26 (1970), U.S.Code Cong. & Admin. News, p. 5715, provides in part: "The committee intends that this provision is to apply to those articles which are designed and held out for sale by manufacturers for camping accommodations.

An example of this is a cap designed for mounting on pickup trucks which, upon installation and together with the truck body sides and the truck floor, provides an area which can be used for sleeping quarters. Articles may be considered as designed for camping accommodations if they have side windows which are screened, have separate rear access doors, and often have ventilation equipment. It is not necessary that the articles have separate floors and lower sidewalls, or that they be able to function as living quarters as well off the truck as they do mounted on the truck, or that a person be able to stand up in them. Where the article was primarily designed for camping accommodations, the exemption will not be affected by the fact that in individual cases the accommodation may have been used on a commercial basis."

roborative of the other circumstances of this case which form the basis of our judgment.

Of much greater importance to our decision is plaintiff's advertising, part of which is quoted below. Defendant contends that plaintiff's advertising refutes the proposition that the camper covers were "designed * * * to be used primarily as living quarters." In March 1966, plaintiff advertised its camper covers as follows:

> SATELLITE PICK-UP COVER. Tailored to fit your pick-up. Converts to an all-weather camping or hauling unit. Perfect for work or play. Baked enamel, maintenance free aluminum exterior adds beauty to pick-up unit. Fully insulated and lined. 12V dome light and running lights standard equipment.

There can be no doubt that this advertisement represents to the ultimate consumer that the "pick-up cover" (camper cover) is designed for multiple purposes. In fact, the record indicates that most purchasers actually used the cover as temporary living quarters on short vacation or recreational trips, or for hauling in the course of a trade or business, or for a combination of both.[12] We must determine for which of these two major functions the cover was *primarily* designed.

Plaintiff was a specialized manufacturer whose "20th Century" product line, excluding for the moment the covers in question, consisted entirely of recreational vehicles of the small trailer or camper type. All such vehicles have been previously exempted from manufacturer's excise tax. The products range from the larger trailer, which is pulled behind an automobile, to the camper sleeper, which neatly fits into the bed of a pick-up truck. As one moves down plaintiff's product list, he finds that each succeeding unit, although performing essentially the same function, *i. e.,* temporary living quarters, is less expensive and less complex in design.

The advertising brochure was most certainly intended for the recreational vehicle market. The slogan associated with the "20th Century" name is: "Tomorrow's Camper Today." The company represents that, within its product line, there will be a model with the right combination of features at the right price for every family's budget. Implicitly at least, plaintiff's camper covers which are advertised in the brochure, were to be included in this blanket representation. No mention is made of a hauling unit in the general advertising, and plaintiff is not represented to be a manufacturer of said units. Indeed, the only reference to hauling is the excerpt quoted above relating to plaintiff's camper covers. However, viewed as a small but integral part of the larger advertising brochure, one is left with the unmistakable impression that the capacity of the recreational unit pickup cover to perform a hauling function is an extra added benefit or inducement to purchase. Reference to a product's secondary capabilities is nothing more than sound business practice.

Within this broader context, it is not unreasonable to conclude that plaintiff's camper covers, as advertised, were designed to be the least expensive and least complex in a line of recreational vehicles, and that the covers were designed with the primary intention of providing lower-income families with the same recreational and leisure time opportunities which accrue to families with higher incomes who can more easily afford the larger and more expensive trailers and campers.

We come now to an examination of certain physical features of the camper

---

12. Defendant also asserts that the cover is fulfilling its primary function as a hauling unit when recreational equipment is stored and transported in the bed of a pickup truck during a vacation or camping trip. However, as explained in the body of the opinion, we believe that transporting and storing recreational equipment, as in the situation described above, is incidental to and consistent with the design and use of the cover as temporary living quarters.

covers. We emphasize at the outset that these features were standard equipment and were therefore included in the cover's total purchase price. As stated previously, each cover was equipped with a roof vent and jalousied window, both of which could be opened to provide ventilation. The roof vent and the windows were fitted with screens to protect the occupant of the unit from insects. Both types of covers had screened entrance doors which could be locked. The insulation was made of spun glass, one inch thick, and kept the interior of the unit cooler in the summer, and warmer in the winter. The wood paneling improved considerably the appearance of the interior. The 12-volt wiring on the inside was easily adaptable for electric lighting. There can be no doubt, and defendant has conceded, that these features were specifically designed or geared for human occupancy.

It was the presence of these same standard features which prompted the District Court to render judgment for the taxpayer in Woodward v. United States, No. 69–C–77, 25 A.F.T.R.2d 1653 (N.D.Okla.1970), aff'd, 442 F.2d 333 (10th Cir., 1971), a case which turned on precisely the same issues we deliberate in the instant case, and which involved almost the identical covers. The court in *Woodward* held that inasmuch as all the aforementioned items were standard equipment and added to the cost of the unit, the camper covers were "designed * * * to be used primarily as living quarters" and thereby exempt from manufacturer's excise tax.

In contradistinction to *Woodward,* however, defendant offers Herren v. United States, 317 F.Supp. 1198 (S.D. Tex.1970), aff'd per curiam, 443 F.2d 1363 (5th Cir., 1971), which, on the surface, appears to be on all fours with *Woodward* and the instant case, and which, to defendant's obvious relief and

satisfaction, was decided in favor of the Government. However, careful scrutiny of the detailed and well-reasoned opinion in *Herren* reveals a most important distinction. Those particular features of plaintiff's covers which are admittedly geared for human occupancy, i. e., insulation, wood paneling, a crank-out roof vent, and 12-volt wiring, were available to Herren's customers *only as options at extra cost.* That is to say, those features were not standard equipment, and were not included in the total purchase price of the unit. They could be added to the cover only at the direct request of the consumer. Thus, Herren's customers were able to purchase a stripped cover which was, in effect, a box without a bottom, which was set upon and enclosed the bed of a pickup truck, which increased the carrying capacity of the truck bed, which afforded protection for the contents of the truck bed, but which provided, as standard equipment no features geared for human occupancy.

Thus, we do not find our decision or that of the District Court in *Woodward* to be in conflict with *Herren.* We have concluded that a manufacturer, whose professed intention is to design a unit to be used primarily as temporary living quarters, with a secondary hauling capacity, would most reasonably manufacture units such as those offered for purchase by plaintiff and the taxpayer in *Woodward.* Said units would include therein, as standard equipment and part of the purchase price, essential items which make the unit suitable for human occupancy. Conversely, it would be most reasonable for a manufacturer, who intends to design a unit to be used primarily for hauling or for the purpose of protecting the contents of the pickup truck, with a secondary use as temporary living quarters, to produce units such as those offered for purchase by the taxpayer in *Herren,* which provide optional equipment, designed for human occupancy, at extra cost.[13]

13. The testimony indicates that approximately 90–95 percent of all camper covers produced by plaintiff included insula- tion and prefabricated wood paneling as standard equipment. However, plaintiff did manufacture a small number of camp-

██ According to the statutory language of the pertinent Code provisions, the critical factor which determines the tax exemption is the *design* of the unit, not the actual use to which the unit is put after sale. Thus, evidence with respect to the actual use of the unit by the ultimate consumer is relevant only insofar as it contradicts or corroborates: (1) the subjective testimony of the designer or other evidence of his intentions; or, more importantly, (2) objective evidence of the use to which one would most reasonably expect the units to be put after sale. At trial both parties introduced evidence of actual use which is briefly summarized below.

It was possible to install, and some purchasers did install, a bed in the front portion of the camper cover, near the cab of the pickup truck. Many purchasers of plaintiff's camper covers regularly used their pickup trucks, with camper covers attached, for transportation in driving back and forth to work on workdays, and occasionally used the units for recreational purposes on weekends, holidays, and vacation periods. Some purchasers used their units exclusively for occasional recreational trips, and did not use the units for driving back and forth to work or other business purposes. On the other hand, some purchasers used their units exclusively for business purposes (*e. g.,* for hauling and protecting equipment used by the owner in carrying on a trade), and did not use them for recreational purposes to any extent.

The recreational activities in connection with which most purchasers of plaintiff's camper covers occasionally used their units consisted of hunting trips, fishing trips, camping trips, or vacation trips. The gear needed in connection with such recreational activities was hauled in the camper covers, which afforded protection from the elements and from thievery. Camper covers were

generally used several nights each year for sleeping purposes by those purchasers who utilized their units in connection with recreational trips. (A mattress, or the equivalent, could be placed on the floor of the truck bed at night if the owner of a camper cover had not installed a bed in it.)

We can draw, from this evidence, certain conclusions which support plaintiff's position that the covers were designed as temporary living quarters. For example, frequency of actual use is not necessarily synonymous with the primary purpose for which the cover is designed. As plaintiff correctly points out, recreational or leisure time is, for most individuals, rather limited. Thus, a family who purchases a recreational vehicle may use it as infrequently as one weekend every few months. Nevertheless, this does not alter the design of the vehicle or detract from its primary function as temporary living quarters.

██ The fact that many of plaintiff's customers drove their pickup trucks to and from work with the covers attached is not significant. It has never been the case that the tax status of temporary living quarters was dependent upon its separability from the mode of transportation, *Cf. Frank Motor Homes, supra,* 230 F.Supp. at 785. Although the primary function of an automobile or truck is transportation and hauling (including in many instances transportation to and from work), said vehicles are fitted with many parts or accessories which are designed to perform functions independent of this general transportation or hauling function. For example, Treasury Regulations on Manufacturers and Retailers Excise Tax, Sec. 48.4061(b)–2 lists, among others, the following items as taxable "parts or accessories"; baby seats for automobiles; automobile beds; bottle warmers and heating pads designed to operate from an automobile cigarette

er covers without insulation and wood paneling, as well as a small number of camper covers which were unusual in design or manufacture. For purposes of

this litigation, plaintiff concedes liability for manufacturer's excise tax with regard to those particular units.

lighter, automobile clocks, *fitted truck top covers*, etc. Each item, although permanently affixed to the vehicle or carried therein when not in use, adds nothing to the vehicle's general transportation function. Yet, each item can be used to perform its specialized function in conjunction with the vehicle at the option of the vehicle's occupant.

Defendant relies heavily upon the fact that one function of plaintiff's camper covers was to provide a secure, weatherproof, and relatively theftproof repository for recreational equipment and other articles which are stored and transported in the bed of a pickup truck during a recreational outing. However, we find this function to be entirely consistent with a proper interpretation of the term "living quarters." "Living quarters" has a broader connotation than simply "sleeping quarters." [14] Indeed, a unit which functions as temporary living quarters does, in effect, provide the individual with a temporary residence. The primary function of a residence, whether permanent or temporary, is to provide shelter and security for the individual *and his possessions*. For this reason, the use of plaintiff's covers on short recreational outings for purposes other than sleeping is in accordance with its primary design as temporary living quarters.

With regard to the hauling and transportation of recreational equipment, plaintiff's covers are comparable to a "camp trailer" or "tent trailer" which has been held by the IRS to be exempt from manufacturer's excise tax. Rev. Rul. 100, 1953–1 Cum.Bull 461. The camp trailer is nothing more than a shallow box on wheels, not suitable for sleeping, which transports and stores a canvas tent and other recreational equipment.

Finally, defendant argues that numerous additions (*e. g.*, bed, stove, etc.) must be made to plaintiff's camper covers before they can be used properly and efficiently as living quarters. The short answer to this is that many articles, which are designed to perform a specific function, are nevertheless, sold without an essential ingredient or part which must be added to the article before it can function properly. For example, many clocks or flashlights are sold without batteries, and most cameras are sold without film. However, this does not alter the primary design and function of the article.

In conclusion, we hold that although, for excise tax purposes, plaintiff's camper covers fall within the statutory definition of automobile truck "parts or accessories" under § 4061 of the Code, said covers are exempt from manufacturer's excise tax, by virtue of § 4063 of the Code for the reason that they were designed to be mounted or placed on automobile truck bodies and to be used primarily as living quarters.

Accordingly, judgment is entered for plaintiff in an amount equal to that which plaintiff has previously paid in partial satisfaction of the taxes and penalties, plus interest, assessed against it.[15] Defendant's counterclaim is dismissed except insofar as it relates to the units, described in plaintiff's amended response to first amended answer, for which plaintiff admits liability for manufacturer's excise tax. For those units, judgment is entered for defendant. The precise amounts to which each party is entitled will be determined in subsequent proceedings under Rule 131(c).

---

14. It seems logical to assume that, had Congress so intended, § 4063(a) (1) could have read "designed * * * to be used primarily as *sleeping quarters.*"

15. The original petition alleges that the amounts paid by plaintiff totaled $69.42. However, defendant's counterclaim concedes that plaintiff's payments totaled $270.92.