Signed: ___Janet H. Olson_____  Date: ___9/21/73_____
Witness: ___Judith A. Montgomery_____  Date: ___9/21/73_____

**Jayne Ann WOODS, Commissioner of Revenue, Appellant,**

v.

**GENERAL OILS, INC., Appellee.**

Supreme Court of Tennessee.

Dec. 5, 1977.

William J. Haynes, Jr., Asst. Atty. Gen., Nashville, for appellant; Brooks McLemore, Jr., Atty. Gen., Nashville, of counsel.

Wayne E. Thomas, Stophel, Caldwell & Heggie, Chattanooga, for appellee.

## OPINION

BROCK, Justice.

This is an action by a taxpayer, General Oils, Inc., to recover sales and use taxes, paid under protest, which were assessed by the defendant Commissioner on the purchase of three large oil tanks and their appurtenances which are used by the taxpayer in its oil merchandising business located on the banks of the Tennessee River at Chattanooga. The trial court granted the plaintiff a recovery and the Commissioner appeals.

The issue presented is whether the tanks in question should be classified as "industrial machinery" within the meaning of T.C.A., § 67–3002(n), which is taxable at the rate of only 1%, whereas, the sale or use of ordinary non-favored property is taxable at the regular rate of 3½%.

The legislature in T.C.A., § 67–3002(n), has defined "industrial machinery" as:

". . . machinery, including repair parts and any necessary repair or installation labor therefor, which is directly and primarily utilized in fabricating or processing tangible personal property for resale. . . ."

Pursuant to statutory authority, the Commissioner of Revenue has adopted Rule No. 1320–5–1–1.06, which, in pertinent part, provides:

" 'Industrial machinery' shall mean machines, including repair parts and any necessary repair or installation labor, and the appurtenances necessary to their working of the machines used directly and primarily in fabricating or processing tangible personal property for sale and use or consumption off the premises. . . *Machines and appurtenances used for material handling prior to the beginning of the first instance of such fabrication or processing or that are used for storage or distribution of the completed manufactured product, . . . are not used directly and primarily as stated above and shall be taxable at the rate of (3½)*

per cent of cost price." (Emphasis added.)

It is these standards which we must apply to the evidence.

The decree of the Chancellor comes to this Court with "a presumption of correctness . . . unless the evidence preponderates otherwise." T.C.A., § 27–304. Thus, our task is to determine whether or not the evidence in the record preponderates against the finding of the Chancellor that the tanks and appurtenances in question were used "directly and primarily in fabricating or processing" the oil which the taxpayer sold to its customers.[1]

General Oils, Inc., is in the business of buying, processing and selling industrial and heating oils at its plant in Chattanooga. It sells to customers located in Tennessee, Alabama, Georgia, North Carolina, Virginia and Kentucky. It receives shipments of oil by way of barges which tie up at its docks on the Tennessee River. The oil is pumped directly from the barges into its tanks located on the bank near the river. General Oils mixes or blends oils of different weights and sulphur contents to obtain oils that meet the specifications of its various customers. It delivers oil to its customers by means of tank trucks which are loaded at its loading platform. Oils of different weights and sulphur content are kept in thirteen separate tanks, e. g., # 6 oil in one tank, # 2 oil in another tank, etc. Blending is achieved at the time of loading the delivery trucks by means of an "in-line proportioner" which draws oil from two or more of the tanks in such quantities that the resulting mixed oils constitute a blend that possesses the weight and sulphur content required by the customer. This blended oil is piped directly from the storage tanks through the proportioner and into the waiting delivery tank trucks.

The Commissioner conceded that the "in-line proportioner" and its appurtenances were utilized directly and primarily in the processing of oil for resale, but denied that

---

1. We do not consider the question whether or not the tanks were "machinery," since the parties have not raised it at the trial or in this Court.

three large tanks at the taxpayer's plant are so utilized. These tanks were purchased by General Oils and erected on its premises in the period from July 1, 1971, through June 30, 1974. It is the sales and use taxes on the purchase of these three tanks that is the subject of this litigation.

It is our conclusion that the evidence preponderates against the finding of the trial court that these tanks were utilized "directly and primarily" in the processing of the taxpayer's oil; in our opinion, the preponderance of the evidence is that the tanks are primarily used for material handling, i. e., storage, of oil prior to the beginning of fabricating or processing of the oil for delivery.

The taxpayer called its Vice President and General Manager, Mr. E. Lee Rayburn, as its chief witness. His testimony is somewhat obscure and indefinite and leaves much to be desired. The experienced trial judge more than once remonstrated with this witness for his unsatisfactory answers which the judge described as "evasive." This witness referred to the three tanks in question as "storage tanks." Thus, he stated: "We bring heavy industrial oils in by barge to our terminal where we pump it into our storage tanks." He stated that these particular tanks ". . . mostly hold # 6 oil." And, again, he stated: "We don't blend this oil and then put it in another tank to store it. Sir, it serves as a storage tank." Finally, he testified:

"Q. Is there a difference between just a tank and a blending tank?

"A. No. Sir. We wouldn't have a tank as such as a blending tank."

Witness Rayburn also testified that the tanks in question also were involved in blending oils, in that, in receiving barge shipments, oil of one weight or sulphur content would be pumped directly from the barge into a tank which was partially filled with oil of a different weight and sulphur content, so that, the resulting mix would have still another weight and sulphur content. He stated that this occurred approximately once each two weeks. He also testified that on occasion oil would be pumped from one tank to another tank containing oil of a different weight and sulphur content, thus achieving oil of another weight and sulphur content. His testimony in this latter regard was greatly weakened, however, by the testimony of Mr. James Carter Zorn, an auditor of fifteen years experience for the Department of Revenue, who was called as a witness for the taxpayer. Mr. Zorn had made the audit which precipitated the additional assessment here at issue. He contradicted Rayburn's contention that blending of oils occurred in the tanks by his testimony that during the auditing Rayburn never said that these tanks were used for blending, but, instead, at that time told him that they were used solely "to store No. 6 and No. 2 oils." He testified:

"Q. And Mr. Rayburn did not go into the process that he has described today?

"A. No.

"Q. Did you ask him a specific question concerning the function?

"A. I asked him what they were doing and he said blending No. 2 and No. 6 oils.

"Q. Where did you think he was doing this?

"A. He was doing it, he explained to me, at the blender where they loaded it into the trucks for delivery."

Mr. Zorn was of the firm opinion that the three tanks in issue, each with a capacity of three million gallons of oil, were primarily used for storage, not the blending of oil.

The only witness called by the Commissioner was Mr. Ray Lane Masemiller, a petroleum chemist with 29 years experience, who testified that the tanks in question were utilized as storage tanks and were not suitable for blending.

In evaluating the foregoing evidence, we must keep in mind that in a suit against the state by a taxpayer claiming an exemption from taxation the burden is on the taxpayer to establish his exemption; every presumption is against it and a well-founded doubt is fatal to the claim. *Hamilton Nat'l Bank v. McCanless,* 176 Tenn. 570,

**436**

144 S.W.2d 768 (1940); *Farrington v. State of Tennessee,* 95 U.S. 679, 24 L.Ed. 558 (1878).

In *Phillips & Buttorff Mfg. Co. v. Carson,* 188 Tenn. 132, 217 S.W.2d 1 (1949), this Court held that, as used in the sales and use tax statute, "directly" means "in direct contact with, and without the intervention of any person or thing."

"Primarily" means "first of all; principally; or fundamentally." *Webster's Third New International Dictionary* (1961). It has also been held to mean "first in rank or importance, chief, principal, basic or fundamental," *Breen v. Ind. Accident Board,* 150 Mont. 463, 436 P.2d 701 (1968); *Twentieth Century Mfg. Co. v. U. S.,* 195 Ct.Cl. 295, 444 F.2d 1109 (1971).

In our opinion, the taxpayer has shown, at most, only a secondary and indirect use of these huge tanks for blending oil; the inescapable conclusion, from a preponderance of the evidence, is that the primary function of the tanks is storage of the oil from the time of its receipt off the barges until it is run through the "in-line proportioner" directly into the delivery trucks. See 68 Am.Jur.2d *Sales and Use Taxes* § 112 (1973) and cases there cited. We conclude, therefore, that the taxpayer has failed in its burden of establishing that it is entitled to the lower rate of tax or partial exemption. Accordingly, the decree of the trial court is reversed and the complaint is dismissed. Appellee will pay all costs.

COOPER, C. J., and FONES, HENRY and HARBISON, JJ., concur.