**Burton SHEARIN, d/b/a Bolivar Sand Company, Appellee,**

v.

**Jayne Ann WOODS, Commissioner of Revenue, Appellant.**

Supreme Court of Tennessee.

April 28, 1980.

Everett H. Falk, Deputy Atty. Gen., William M. Leech, Jr., Atty. Gen., Nashville, for appellant.

David O. Kemp, Bolivar, for appellee.

## OPINION

COOPER, Justice.

Burton Shearin, d/b/a Bolivar Sand Company, brought this action to recover sales and use taxes paid under protest. The payment was the result of an assessment by the defendant Commissioner of Revenue of sales taxes allegedly due on the purchase by plaintiff of a backhoe and a front wheel loader. The chancellor concluded the machinery was "industrial machinery" within the meaning of T.C.A. § 67–3002(n), that the sales and use tax of 1% paid by plaintiff on the purchase of the machinery was all the tax due, and awarded plaintiff a recovery of the sales and use taxes paid under protest. The Commissioner appealed, contesting the classification of the machinery as "industrial machinery."

■ It is undisputed that "industrial machinery" is subject to a sales and use tax of only 1%, while other tangible property presently is subject to a sales and use tax of 4½ %. As noted in appellant's brief, "in the case of *Woods v. General Oils, Inc.*, 558 S.W.2d 433 (Tenn.1977), [this court] viewed the preferential sales and use tax rate for 'industrial machinery' as a partial exemption, thereby bringing into play the general rule that in a suit against the State by a taxpayer claiming an exemption, the statute is construed strictly against the taxpayer with the taxpayer bearing the burden to establish his entitlement to the exemption. See *Hamilton Nat'l Bank v. McCanless*, 176 Tenn. 570, 144 S.W.2d 768 (1940). Accordingly, plaintiff, in claiming the benefit of the 'industrial machinery' preferential rate, has the burden of establishing that his equipment or machinery meets the requirements of the statutory definition, against the plaintiff. *Woods v. General Oils, Inc.*, 558 S.W.2d at 435."

"Industrial machinery" is defined in T.C.A. § 67–3002(n) as:

. . . machinery, including repair parts and any necessary repair or taxable installation labor therefor, which is directly and primarily utilized in fabricating or processing tangible personal property for resale . . . .

Pursuant to statutory authority, the Commissioner of Revenue promulgated Rule 1320–5–1–1.6 interpreting the "industrial machinery" requirements as excluding "[m]achines and appurtenances used for material handling prior to the beginning of the first instance of such fabrication or processing or that are used for storage or distribution of the completed manufactured product."

The above statutory definition and rule were acknowledged by this court to be the standards which must be applied to evidence of use to be made of machinery by a taxpayer in determining whether he is entitled to the preferential sales tax rate afforded to a purchaser of "industrial machinery." *Woods v. General Oils, Inc.*, 558 S.W.2d 433, 434 (Tenn.1977).

■ Under these standards, we see no basis in the evidence to justify the chancellor's classification of the front wheel loader as "industrial machinery." According to the plaintiff, the wheel loader was intended to be and is used after the completion of the mining and the sand processing operation, primarily to load sand on trucks for distribution to customers.

■ The backhoe, on the other hand, is used directly in the mining process. The

sand mine is in a swampy area. A site is cleared of all trees, shrubs, and debris. The backhoe is then moved onto the mining site and is used to excavate and sort "muck," which is variously described as "sandy dirt" or "dirty sand." The material excavated is sorted, primarily on the varying amounts of sand in the muck, which determines the use to be made of the material.

. . . [T]he material varies widely and some of it is acceptable to go one place and some of it is acceptable to go another.

The excavated material is sold to be used in road construction, building foundations, and fill for low lying land, and accounts for approximately one-sixth of the total revenue from the mine.

On removal of the muck, sandy dirt, and dirty sand by use of the backhoe, a dredge is moved onto the site. "[B]asically it's a huge agitator, that mixes sand and water, sucks it into a big pump, and this pump pumps it through a pipeline onto the bank, where the remaining sticks or mud or dirt is sorted from the sand and the sand is separated into grades, and then the sand is separated from the water, put on conveyor belts and these belts put the material into piles. . . . "

The State likens the use of the backhoe to machinery used in stripping overburden from a seam of coal, and argues that the backhoe is not "directly and primarily" used in the mining process but is used merely for site preparation or to remove overburden. We see a basic difference between the use made of the backhoe and machinery used to remove the overburden from a seam of coal. The overburden from a strip mine is moved to get to the product to be mined. In the plaintiff's operation, the backhoe is used to remove and sort a salable product from the mine, just as is the dredge-agitator which is conceded to be "industrial machinery." We hold, therefore, as did the chancellor, that the backhoe properly should be classified as "industrial machinery" and be subject to the preferential tax rate of 1%.

The decree of the chancellor is modified to permit recovery of sales tax and interest paid under protest on the backhoe only, which amount is $1,999.20. Judgment will be entered accordingly.

BROCK, C. J., and FONES, HENRY and HARBISON, JJ., concur.