The AUSTIN COMPANY and Arapahoe Chemicals, Inc., Plaintiffs-Appellees,

v.

Jayne Ann WOODS, Commissioner of Revenue of the State of Tennessee, Defendant-Appellant.

Supreme Court of Tennessee, at Nashville.

June 1, 1981.

Rehearing Denied Aug. 24, 1981.

James C. Gooch, Jay S. Bowen, and George H. Masterson, Bass, Berry & Sims, Nashville, for plaintiffs-appellees.

David S. Weed and Kathryn Behm Celauro, Asst. Attys. Gen., Nashville, for defendant-appellant.

DROWOTA, Justice.

Austin Company and Arapahoe Chemicals, Inc., sued the Commissioner of Revenue to recover sales and use taxes, penalty and interest totalling $19,211.58 paid under protest for consulting, engineering, design and procurement services rendered by Austin to Arapahoe as well as for overhead and profit in connection with the construction of a chemical manufacturing facility in Newport, Tennessee. The Chancellor held for the plaintiffs and awarded them a refund of the taxes paid plus interest. The Com-

missioner has perfected a direct appeal from the final order of the Chancellor.

Arapahoe Chemicals, Inc., a Delaware corporation with its principal place of business located at Boulder, Colorado, is in the business of manufacturing chemicals, primarily for the use of other chemical and pharmaceutical companies. In January, 1974, it purchased a chemical manufacturing plant in Newport, Tennessee. Arapahoe used the plant for manufacture of N-Acetylsulfanilyl Chloride, or ASC, a major building block in the manufacture of sulfa drugs. In early 1975, Arapahoe developed a new laboratory technology for the production of ASC that would reduce the amount of pollution generated in the production process. In April, 1975, Arapahoe hired the Austin Company, an Ohio corporation with its principal place of business located in Cleveland, Ohio, to study the feasibility of the commercial application of the new technology. In October, 1975, Austin completed the study, concluding that the new production method was commercially feasible. For this initial study, Austin billed Arapahoe approximately $60,000.00. Arapahoe then commissioned Austin to perform further engineering studies and to come up with a more definitive design estimate of the cost to construct a plant, for which it billed Arapahoe an additional $420,000.00. The results of these studies were submitted to Arapahoe in February, 1976.

In March, 1976, Arapahoe decided to construct a new ASC plant in Newport with the new technology. On March 31, 1976, Arapahoe entered into a contract with Austin whereby Austin agreed to act as a general contractor on the project. The contract was a cost-plus contract under which Austin was to be paid for the costs it incurred plus a fixed commission. The contract was made retroactive to April 30, 1975, in order to incorporate Austin's charges for the preliminary feasibility studies.

The contract called for Austin to "provide all the engineering, materials and equipment, except as may be provided by Owner, and services and perform all the work required for the construction of the ASC production facilities...." In procuring materials and equipment, Austin would first draw up specifications of the materials to be purchased. After Arapahoe approved the specifications, Austin solicited bids from a list of suppliers. The list of suppliers from which Austin sought bids as well as the supplier finally selected were subject to Arapahoe's approval. Suppliers were paid by a check drawn on an Austin bank account. The bank account was funded solely by Arapahoe in amounts equal to Austin's monthly cost estimates.

Austin paid Tennessee sales and use taxes for the years 1976 and 1977 based on the cost of the items of tangible personal property purchased for Arapahoe and on the costs of installing the items of tangible personal property. After completion of the project, the Commissioner audited the project and assessed Austin an additional $17,919.33 for sales and use taxes, penalty and interest for 1976 and 1977. The auditor arrived at this figure by first separating all amounts paid by Arapahoe to Austin into five accounts: 1) industrial machinery; 2) tank storage; 3) site preparation; 4) buildings; and, 5) overhead. The overhead account included fees for the engineering, designing and consulting services provided by Austin prior to March 31, 1976. In addition, it included office overhead in Chicago where these services were performed, general overhead at the Newport construction site and Austin's commission or profit. The auditor reallocated the amount in the overhead account to the other four accounts based on the ratio each bore to the whole, exclusive of the overhead account itself. The amounts thus added to the industrial machinery and tank storage accounts were included in the sales and use tax base for the project and taxed accordingly. The site preparation and building accounts, involving real property, are not taxable under the sales and use tax provisions found at T.C.A. § 67–3001 et seq.

Arapahoe paid the tax, penalty and interest under protest. Subsequent to the audit, Austin received additional money from

Arapahoe for which Austin paid under protest a sales and use tax of $1,292.55 bringing the total amount in controversy to $19,211.58.

## I.

Before reaching the merits of the tax proceeding, we first address the contention of the Commissioner that neither appellee has standing to contest $17,919.33 of the total amount assessed. The initial deficiency of $17,919.33 was assessed against Austin, but paid by Arapahoe pursuant to a provision in their contract in which Arapahoe agreed to pay any sales and use taxes incurred by Austin related to the Newport project. A taxpayer wishing to contest an assessment as unjust or illegal must comply with the following provision:

> 67–2303. *Payment of tax under protest.*—In all cases where not otherwise provided in which an officer, charged by law with the collection of revenue due the state, shall institute any proceeding, or take any steps for the collection of the sum alleged or claimed to be due, by said officer, from any citizen, the person against whom the proceeding or step is taken shall, if he conceives the same to be unjust or illegal, or against any statute or clause of the Constitution of the state, pay the same under protest.

The Commissioner reasons that Austin lacks standing to contest this amount since it is not the "person" who paid $17,919.33 under protest as required by § 67–2303.[1]

■ The construction the Commissioner places on the statute is unduly narrow. The primary intention of the statute is "to prevent delay in the collection by the State of its essential revenues." *American Can Co. v. McCanless*, 183 Tenn. 491, 193 S.W.2d 86 (1946). So long as the assessment is properly paid under protest, the fact that the assessed party is not the party who actually paid the tax is irrelevant. We therefore hold that Austin has standing to contest the entire amount in controversy.

■ The Commissioner asserts that Arapahoe has no standing to challenge any of the amounts assessed against Austin, since Arapahoe was not "the person against whom the proceeding or step [was] taken." T.C.A. § 67–2303. Arapahoe does not contest the assessment merely because it must bear the economic consequences of the tax, as perhaps would any purchaser of the chemical produced at the Newport plant. Neither is Arapahoe intervening because it voluntarily undertook responsibility for Austin's sales and use tax liability. Arapahoe was obligated to pay the tax and did in fact pay it pursuant to its contract with Austin. The State suffered no loss of essential revenues during the pendency of the lawsuit. Since Arapahoe has paid the tax pursuant to its contractual obligation, it is entitled to be subrogated to whatever rights and remedies Austin has against the Commissioner for the recovery of the taxes paid under protest. *See*, 73 Am.Jur.2d *Subrogation* § 11 (1974).

The Commissioner relies on *Brodbine v. Torrence*, 545 S.W.2d 743 (Tenn.1977), in opposing Arapahoe's claim to standing. In *Brodbine*, the Court held that the plaintiffs, a class of retailers of liquor for on-premises consumption, had no standing to challenge a municipal tax on sales of liquor by wholesalers. The plaintiffs, however, did not pay the allegedly illegal tax. They had no express liability for tax either by statute (or ordinance) or contract. They claimed standing merely because the tax was allegedly passed on to them in the form of higher wholesale liquor prices. The doctrine of subrogation clearly did not apply under those facts. We therefore hold that both plaintiffs have standing to contest the tax assessed against Austin.

## II.

■ The Commissioner seeks to tax the engineering, design and consulting services, overhead and profit on the theory that these items fall within the meaning of the term "sales price" as defined in T.C.A. § 67–3002(d), as follows:

---

1. The Commissioner concedes that Austin has standing to contest $1,292.25 which was assessed against and paid by Austin under protest after Arapahoe paid the initial deficiency.

"Sales price" means the total amount for which tangible personal property is sold, including any services that are a part of the sale, valued in money, whether paid in money or otherwise, and includes any amount for which credit is given to the purchaser by the seller, without any deduction therefrom on account of the cost of the property sold, the cost of materials used, labor or service costs, losses, or any other expense whatsoever; provided, that cash discounts allowed and taken on sales shall not be included; provided, that the term "sales price" shall not include any additional consideration given by the purchaser for the privilege of making deferred payments regardless of whether such additional consideration shall be known as interest, time price differential on conditional sales contracts, carrying charges or any other name by which it shall be known.

This Court was faced with a similar situation in *Cities Service Co. v. Tidwell*, 534 S.W.2d 298 (Tenn.1976). In *Cities Service* the Department of Revenue assessed additional sales tax against the owner of an industrial plant on the theory that the engineering and design skill of the general contractor had transformed the many individual units of industrial machinery purchased from third party vendors into several industrial complexes, each of which constituted a unit of industrial machinery subject to sales tax. Although acknowledging that the sales tax statutes contemplate taxing the ideas, skill and labor needed to transform raw materials into tangible personal property, the Court held that the "sales price" for the purposes of § 67–3002(d) are limited to "services rendered by the seller, as a part of the sale to the purchaser. They do not embrace services rendered by a third party to the sale." *Id.* at 303.

The Commissioner contends that *Cities Service* can be distinguished on the ground that in *Cities Service* the subcontractor was also a party, whereas here the general contractor and the owner are the only parties. This distinction is without merit. It is only necessary that there are third party vendors who sold the units of industrial machinery to the owner. Their presence as parties to the lawsuit is irrelevant.

In the instant case, the services of Austin are those rendered by a non-vendor. With regard to taxation under § 67–3002(d), we hold that *Cities Service* is controlling and affirm the Chancellor.

■ Alternatively, the Commissioner relies on T.C.A. § 67–3002(c)(4)(F) which includes within the definition of a taxable retail sale:

The installing of tangible personal property which remains tangible personal property after installation where a charge is made for such installation whether or not such installation is made as an incident to the sale thereof and whether or not any tangible personal property is transferred in conjunction with such installation service.

Pursuant to this provision, Austin paid sales and use tax on the direct labor costs used to install items of machinery and equipment. The Commissioner argues that *Hoyer-Schlesinger-Turner, Inc. v. Benson*, 479 S.W.2d 223 (Tenn.1973), is authority for construing "installation labor" under § 67–3002(c)(4)(F) broadly enough to encompass the activities she here wishes to tax. In *Hoyer*, however, the Court merely held that "the labor cost incurred in installing the machinery at the construction site" was a taxable installation charge. *Id.* We see no way in which the activities of Austin in performing engineering, design and consulting services can be construed to be installation services within the meaning of the statute.

The decree of the Chancery Court of Davidson County is affirmed.

HARBISON, C. J., and FONES, COOPER and BROCK, JJ., concur.