# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 30, 2001 Session

## A T & T CORP. v. RUTH JOHNSON, COMMISSIONER OF REVENUE, STATE OF TENNESSEE

**Appeal from the Chancery Court for Davidson County**
**No. 95-2998-III and 97-2800-III      Ellen Hobbs Lyle, Chancellor**

---

**No. M2000-01407-COA-R3-CV - Filed October 8, 2002**

---

This case involves (1) the issue of the liability of AT&T for sales and use taxes assessed by the Commissioner for the years 1990 through 1994, and (2) the issue of whether the Chancery Court had subject matter jurisdiction to adjudicate a claim for refund of taxes where the taxpayer failed to file a formal claim for each of the years, 1993 excepted, "under oath and supported by proper proof." AT&T sold telephone central office equipment and provided engineering services to BellSouth and insisted that these sales and services were industrial machinery and therefore exempt from sales and use taxes.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part and Remanded**

BEN H. CANTRELL, P. J., M. S., WILLIAM B. CAIN, J., WILLIAM C. KOCH, JR., J.

Gregory G. Fletcher, Memphis, Tennessee, for appellant, AT&T Corp.

Paul G. Summers, Attorney General & Reporter; Charles L. Lewis, Deputy Attorney General; Daryl J. Brand, Associate Solicitor General, for the appellee, State of Tennessee

## OPINION
## PER CURIUM

### I.

The Commissioner of Revenue conducted a sales and use tax audit of AT&T Corp. for a five-year period beginning January 1, 1990 and concluded that its sales of telephone central office equipment did not qualify for an exemption from taxation as sales of industrial machinery. A Notice of Assessment for $25.81 million was issued, and AT&T timely filed this action (1) challenging the Commissioner's assessment, and (2) seeking remission or credit for such taxes previously paid by it on engineering services furnished to BellSouth.

The Commissioner asserted the propriety of her action in issuing the Notice of Assessment, and denied that AT&T was (1) entitled to a recovery or credit for prior years, and (2) that the Chancery Court lacked jurisdiction to entertain an action for refund of taxes paid for the period involved, 1993 excepted, because AT&T failed to follow the statutory scheme relative to the recovery of taxes.

## II.

The Chancellor held, on cross motions for summary judgment, that (1) AT&T did not qualify for the industrial machinery exemption, (2) AT&T's claim that its engineering services provided to BellSouth were non-taxable was well taken, and (3) that the Chancery Court had subject matter jurisdiction of the issue.

Both parties appeal. Review is *de novo* with no presumption of correctness. ***Nuclear Fuel Services Inc. v. Huddleston***, 920 S.W.2d 659 (Tenn. Ct. App. 1995). The issues presented for review are (1) whether telephone central office equipment sold by AT&T to BellSouth, *et al.*, qualifies for an exemption from sales and use tax as industrial machinery, (2) whether engineering services provided by AT&T to BellSouth, *et al.,* in conjunction with the sale of telephone central office power, transmission and switching equipment were subject to sales tax, and (3) whether the failure of AT&T to comply with the jurisdictional requirements of Tenn. Code Ann. § 67-1-1802 deprived the trial court of jurisdiction to adjudicate the claim for a refund.

## III.

We shall first consider the issue of the jurisdiction of the courts to consider AT&T's claims for refund or credit for taxes paid on alleged industrial machinery sales for 1990, 1991, 1992, and 1994.

It is not controverted that AT&T did not file formal claims for refund for these years "under oath and supported by proper proof," as required by Tenn. Code Ann. § 67-1-1802(a)(1).

The Chancellor assumed jurisdiction of the claim for refund, relying on Tenn. Code Ann. § 67-1-1801(i) which provides:

> (i) To the extent of any amounts collected by or paid to the commissioner with respect to an assessment, or any portion thereof, challenged by suit by the taxpayer, whether such collection was pursuant to a jeopardy proceeding by application of assets restored to the taxpayer pursuant to subsection (h), or otherwise, the suit shall proceed as a timely suit for refund or taxes paid, as if a timely claim for refund had been filed by the taxpayer and denied by the commissioner.

This statute is inapplicable to the case at Bar. It is applicable only to taxes collected by or paid to the Commissioner of Revenue with *respect to an assessment*, and it is undisputed that

AT&T's payments in 1990, 1991, 1992, and 1994 were not paid "with respect to an assessment" for that period because no assessment was made until June 1995. We agree with the argument of the Commissioner that Tenn. Code Ann. § 67-1-1801(i) applies only to taxes collected or paid after an assessment has been issued and a timely suit has been filed.

Statutes authorizing suits against the State are in derogation of sovereign immunity, and must be strictly construed. *Automobile Sales Co. v. Johnson*, 174 Tenn. 38, 41, 122 S.W.2d 453, 455 (1938). Statutes permitting and providing procedures for suits against the state, and especially suits involving taxes, are jurisdictional and must be strictly construed so as to limit such jurisdiction. *Griffith Motors, Inc. v. King*, 641 S.W.2d 200 (Tenn. 1982).

In *Beare Co. v. Olsen*, 711 S.W.2d 603 (Tenn. 1986), the Beare Company filed suit seeking a refund of sales taxes which had been paid on Beare's purchases of electricity, gas, and water from the City of Humboldt. The Commissioner of Revenue filed a motion to dismiss for lack of subject matter jurisdiction due to the Beare Company's failure to satisfy the statutory provisions for tax suits. The Chancellor ruled that the Beare Company "substantially complied" with the statutory prerequisites for suit, and denied the Commissioner's motion.

The Supreme Court reversed, reaffirming the settled principle that suits for tax refunds are suits against the State and can be maintained only in the manner and upon the conditions consented to by the State. *See, also, **L. L. Bean Inc. v. Bracey***, 817 S.W.2d 292 (Tenn. 1991) holding that the statutory scheme provides the exclusive authority for determining liability with respect to taxes collected or administered by the Department of Revenue. Accordingly, we hold that the trial court was without jurisdiction to adjudicate the claims for refund for 1990, 1991, 1992 and 1994.

**IV.**

The principal issue in this case is whether telephone central office power, transmission, and switching equipment sold by AT&T Corp. to BellSouth, *et al.*, qualified as industrial machinery exempt from sales and use tax.

The undisputed facts are derived from the affidavits and depositions of engineers and a professor of electrical engineering and may be appropriately condensed from the briefs.

A: Central Office Power, Transmission, and Switching Equipment.

For the years involved, AT&T Corp. manufactured and sold power, transmission, and switching equipment to BellSouth and others for use in telephone central offices, which are locations in a telephone network where the telephone line of a person making a phone call is connected either to the line of the person being called or to a trunk line connecting to another central office along the network.

Central office power equipment is used to generate and supply electrical current and voltage for central office operations and for telephones connected to the central office; transmission equipment is used to "bundle" and "amplify" telephone calls for transmission between central offices, and switching equipment is used to connect the telephone caller with the party being called.

BellSouth is primarily a land-line telephone company providing local telephone service and certain intrastate toll telephone services to customers in several southeastern states, including Tennessee. Its telephone network consists of wires and equipment connecting with other similar systems to form a local, state, national, and international telephone network. As part of its network, BellSouth had over 190 telephone central offices located in Tennessee, each utilizing power, transmission, and switching equipment necessary for BellSouth to provide telecommunications service.

Telephone service is provided essentially by electrical signals passing through conductive lines to the customers' telephones. Electrical current flows from the telephone company's central office to the customer's telephone, and then back to the central office. The electricity that flows through the telephone lines serves no useful purpose other than as a medium of telecommunication.

More than 90 percent of BellSouth's sales revenues in Tennessee during the audit period were derived from switching and transmitting telephone calls either from or to BellSouth customers. Its customers are charged a flat rate for a specified time period (usually one month) for local exchange service, or on the basis of measured usage, such as the number or duration of calls during a given period, for long-distance calls. Billing is not based on a measure of electricity used.

During the relevant time period, BellSouth never applied for or received from the Tennessee Department of Revenue an authorization under Sales and Use Tax Rule 1.06 (Tenn. Admin. Comp. 1320-5-1-1.06) to purchase industrial machinery exempt from sales and use tax.

B. Line or System Engineering Services.

In conjunction with its sales of central office power, transmission and switching equipment to BellSouth during the audit period, AT&T Corp. also typically provided certain services, which included installation of the equipment in central offices and engineering the equipment. AT&T Corp.'s invoices to BellSouth itemized separate charges for equipment, installation and engineering.

System engineering services are performed in connection with the expansion or modification of telephone central offices. A telephone central office is a facility which is owned and operated by a local telephone company, such as BellSouth, and which houses many different types of sophisticated telephone equipment for generating, switching and transmitting telephone calls.

No two central offices are alike. The type and layout of equipment within central offices will vary depending on factors such as: the central office's position within the telephone network (*e.g..* urban or rural); the customer base served by the office (*e.g.,* residential or commercial); and the

-4-

classes and types of service offered to subscribers (*e.g.,* call waiting, caller ID, call forwarding, etc.). Telephone central offices are generally in a constant state of growth and evolution.

BellSouth's purpose in obtaining system engineering services from outside vendors, such as AT&T Corp., is to expand central office capacity without the interruption of service to BellSouth's telephone subscribers.

AT&T Corp.'s "system engineering services" involve the following specific tasks:

a. Analyzing and consulting with a vendee, such as BellSouth, concerning the selection of the particular equipment required by the central office:

b. Determining how to connect new equipment with existing central office equipment so as to prevent interruptions in subscriber telephone service;

c. Maintaining updated records of equipment configuration and the designing status of each office;

d. Determining the compatibility of the proposed additions with the existing system, including the location of component parts, routing of wires and cables, adequacy of power sources, and integration with testing systems, and lighting and alarm systems; and

e. Preparing detailed specifications which tell installers (usually by reference to pre-existing publications) how to install equipment; what paths to take through the central office for new or relocated cable; where to terminate cables; and other details.

Engineering services are unique to each central office, *not* to the equipment itself, *i.e.,* engineering specifications take into account the existing equipment, layout, power supply, etc., of a particular central office and the specific alterations required by the project. If an equipment order for one central office were to be canceled, new specifications would be required to integrate the same pieces of equipment into a different central office.

The *system* engineering services which are the subject of this case are distinct from *design* engineering services, which consist of engineering and design work associated with the manufacture of standardized pieces of telephone equipment. AT&T Corp. does not dispute that the cost of *design* engineering services are properly part of the "sales price" of the equipment.

The *system* engineering services which are the subject of this case are distinct from *installation* services, which consist of the physical placement or mounting of equipment; wiring and interconnection of equipment; testing; "power-up"; and "cut-over," and placing in service. Installation services sold by AT&T Corp. are furnished by an entirely different group from AT&T Corp.'s system engineer, and are frequently performed by the vendee itself, such as BellSouth, or by third-party installers engaged by the vendee. AT&T Corp. charges its Tennessee vendees sales tax on its installation services and does not claim that its installation services are non-taxable in Tennessee.

-5-

Vendees, such as BellSouth, generally plan, administer and execute modifications to their central offices on a "project" basis. BellSouth initiates orders for engineering services by preparing a "telephone equipment order," or "TEO," and forwarding it to the vendor. TEOs comprise the basic purchase order for specific items of equipment, engineering services, or installation services. TEOs generally specify whether the order is for engineering ("E"), equipment ("F"), installation ("I"), or some combination thereof. For a single project, BellSouth may issue multiple TEOs, and may acquire equipment and services from more than one vendor for the same project.

BellSouth acquires line or system engineering services from vendors, such as AT&T Corp., pursuant to master contracts or "general agreements" which govern most aspects of the purchaser-vendor relationship. These master contracts specifically permit BellSouth to contract with vendors *other* than AT&T Corp., and permit BellSouth to acquire equipment, engineering services, and installation services, either separately on in combination.

Although system engineering services are frequently ordered on the same TEO as an equipment order, engineering services are separately identified on the TEO and are *optional* with the vendee, *i.e.,* in any central office project, BellSouth has the options to:

a. order materials without system engineering services (F only);
b. order system engineering services alone (E only);
c. furnish materials, and equipment manufactured by another vendor to be system engineered by AT&T Corp.; or
d. furnish its own equipment to be system engineered by AT&T.

Even where BellSouth acquires both central office switching equipment and system engineering services from AT&T Corp., BellSouth will almost invariably obtain certain equipment, such as alarms, test kits and monitoring equipment, from third-party vendors. In the transmission area, it is common for BellSouth to contract with AT&T Corp. for system engineering services but to acquire equipment such as DSX (digital cross-connect) panels manufactured by vendors other than AT&T Corp.

AT&T Corp. prices its system engineering services and equipment separately. More specifically:

a. Prices of AT&T Corp.'s system engineering services are based on time studies which predict the average amount of time it takes to perform a particular service.
b. There is no correlation between the price of a tangible product supplied by AT&T Corp. and the price of the system engineering services required to engineer the product into (or out of) an existing system. Because system engineering services are priced on the time it takes to perform the service and on project complexity (and not on the price of the equipment ordered), the price of system engineering services generally decreases with multiple orders

of equipment. By contrast, the price of an item of equipment remains generally the same, regardless of the number of pieces ordered or where they are placed. (Large volume customers, like BellSouth, may receive a discount based on the total volume of purchases of both equipment and engineering services.)

c.   System engineering services ordered by a vendee must be paid for, irrespective of whether the vendee ultimately cancels the equipment order. If a telephone company customer cancels an equipment order involving both equipment and system engineering services, the telephone company must pay for engineering services rendered prior to cancellation and for engineering services necessary to restore records to their original condition.

AT&T Corp.'s engineering services and equipment are warranted for different periods. AT&T Corp.'s warranty for engineering services is 6 months; AT&T Corp.'s warranty for tangible products is a minimum of one year, with many products (*e.g.*, cable) warranted for much longer periods.

During the period 1990 through 1994, central office power, transmission and switching equipment was manufactured and sold by AT&T Corp. through divisions entirely separate from the systems engineering group.

Irrespective of whether BellSouth acquires system engineering services from AT&T Corp. separately or in combination with other services or equipment, AT&T Corp. bills its charges for engineering services separately, and bills BellSouth for system engineering services electronically.

**V.**

Tenn. Code Ann. § 67-6-206(a) provides succinctly that after June 30, 1983, no tax is due with respect to industrial machinery.

Tenn. Code Ann. § 67-6-102(13) defines industrial machinery as

(A) Machinery, apparatus and equipment with all associated parts, appurtenances, and accessories . . . which is necessary to, and primarily for, the fabrication and processing tangible personal property for resale and consumption off the premises, . . . *where the use of such machinery, equipment or facilities is by one who engages in such fabrication or processing as one's principal business. . . .*

. . .

(D) *Such industrial machinery* necessary to and primarily for the fabrication and processing of tangible personal property for resale or used primarily for the control of air pollution or water pollution includes, but is not limited to:

. . .

> (i) Machines used for generating, producing, and distributing utility
> services, electricity, steam, and treated or untreated water; . . . .

[Emphasis added.]

In ***Tennessee Farmers Cooperative v. States***, 736 S.W.2d 87 (Tenn. 1987), a guiding principle with respect to claims of exemption from taxation was clearly reaffirmed:

> Plaintiff comes to this Court with "the heavy and exacting burden of proving the error in the assessment," ***Stratton v. Jackson***, 707 S.W.2d 865 (Tenn. 1986). Moreover, while tax statutes are generally construed in favor of the taxpayer, ***Moto-Pep, Inc., v. McGoldrick***, 202 Tenn. 119, 128, 303 S.W.2d 326, 330 (1957), "[i]n a suit against the State by a taxpayer claiming exemption from taxation, the taxing statute is construed strictly against the taxpayer. The burden is on the taxpayer to establish his exemption. The presumption is against the exemption, and exemption from taxation will not be read into a taxing statute by implication." ***Hamilton National Bank v. McCanless,*** 176 Tenn. 570, 574, 144 S.W.2d 768, 769-770 (1940) (citations omitted). *See, also,* ***LeTournear Sales & Service, Inc. v. Olsen***, 691 S.W.2d 531, 534 (Tenn. 1985); ***Woods, v. General Oils, Inc.***, 558 S.W.2d 433, 435 (Tenn. 1977); ***American National Bank and Trust Co. of Chattanooga v. MacFarland***, 209 Tenn. 263, 268-289, 352 S.W.2d 441, 443 (1961).

The Commissioner argues that under the general definition, "machinery, apparatus and equipment" qualify as exempt industrial machinery only if it is used by one whose principal business is the fabrication or processing of tangible personal property for resale. This argument appears to be consonant with the plain language of the statute. *See*, ***Tennessee Farmers Cooperative v. State***, *supra*.

AT&T argues that it qualifies for the utility services exemption provided in subsection (D)(i) of the statute. We agree with the Chancellor that this subsection does not provide an independent, or separate, exemption, but must be considered in context with subsection (A), citing ***Tibbals Flooring Co. v. Huddleston***, 891 S.W.2d 196 (Tenn. 1994) for the proposition that the threshold question for the exemption is whether the requirements of subsection (A) are being satisfied.

AT&T argues that central office equipment generates and processes electrical current and voltage, and that electricity constitutes tangible personal property within the definition of Tenn. Code Ann. § 67-6-102(28). Our Supreme Court has so held; *see,* ***Texas Eastern Transmission Corp. v. Benson***, 480 S.W.2d 905 (Tenn. 1972). AT&T extrapolates this principle to conclude that BellSouth is engaged in the sale of electricity. We cannot agree, because BellSouth "is primarily a land-line telephone company providing local exchange and certain intrastate toll telephone services to subscribers." We agree with the Chancellor that what BellSouth sells is a service ---

telecommunication --- and that AT&T is not entitled to exempt, as industrial machinery, its sale of central office equipment to BellSouth.

## VI.

The Chancellor ruled that system engineering services performed by AT&T with its sales of equipment to BellSouth were not subject to sales tax, because the services were not "part of the sale of tangible personal property."

The Commissioner insists that this legal conclusion is erroneous because the engineering was an essential prerequisite to the installation of the complex equipment.

The engineering services at issue would begin when AT&T received a telephone equipment order ("TEO") from its customer. The order would be analyzed and reduced to specifications which were a detailed listing of all of the actual items that would be needed to provide the ultimate installation of working equipment. Engineering would identify associated equipment, racking, and cabling that would be needed for a functioning installation of the basis equipment and would check the customer's order to ensure that the ordered equipment would be compatible with the existing equipment in the central office. Engineering would also plan the physical placement of the equipment within the existing central office, including cables, connections, racking, and lighting. A blueprint showing the appropriate placement and connection of the equipment would be prepared. The specifications and associated information would be provided to the installers to guide them in the installation. Switches and transmission equipment were generally sold to BellSouth during the audit period engineered, furnished, and installed.

Pursuant to Tenn. Code Ann. § 67-6-202(a), sales tax is imposed at a stated percentage of the sales price of tangible personal property sold in this state. Tenn. Code Ann. § 67-6-102(26) provides that:

> "Sales price" means the total amount for which a taxable service or tangible personal property is sold, *including any services that are a part of the sale of tangible personal property*, valued in money, whether paid in money or otherwise. . . .

[Emphasis added.]

The issue here is whether the described engineering services were a part of the sales of the central office equipment. AT&T argues that the engineering services are nontaxable because the services were "true" services, and because they often involved some items from other equipment vendors. Many of the sales of transmission or switching equipment apparently were in conjunction with larger central office expansion projects, often involving some components provided by third-party vendors or by BellSouth itself, although, at least for switches, the overwhelming majority of the materials would be furnished by AT&T.

-9-

The use of some items provided by a third party does not insulate AT&T from the full application of the sales tax to its sale of tangible personal property and related services. AT&T argues the contrary, and relies on the cases of *Cities Service Co. v. Tidwell*, 534 S.W.2d 298 (Tenn. 1996), and *Austin Co. v. Woods*, 620 S.W.2d 73 (Tenn. 1981). We do not believe these cases support AT&T. *Cities Service* holds that engineering, design, procurement, and administrative services are not taxable where provided by a non-vendor of tangible personal property. That case involved services by a party who sold no tangible personal property at all. The *Austin* case also holds that the term "sales price" for the purposes of Tenn. Code Ann. § 67-6-102 is limited to "*services rendered by the seller, as part of the sale to the purchases.*" In *Austin*, the court found that "the services of Austin are those rendered by a non-vendor." The logic of both cases is that the "sales price" of tangible personal property cannot include services rendered by one who was not the vendor of any tangible personal property, and does not support the proposition that the mere presence of components furnished by another vendor automatically insulates from tax all design engineering services performed by the major vendor. In the case at Bar, AT&T is a substantial vendor of the tangible personal property involved; and is not a "third party" to its own sales of tangible personal property to BellSouth, regardless of the circumstance that some other items in the overall project were purchased from other vendors.

AT&T also argues that its system engineering services are nontaxable because they were priced separately, warranted separately, and separately stated on customer invoices. The separateness of the cost of engineering services in not relevant. *See, Thomas Nelson, Inc., v. Olson*, 723 S.W.2d 621, 622 (Tenn. 1987); *Saverio v. Carson*, 208 S.W.2d 1018 (Tenn. 1948). Neither are AT&T's warranty policies relevant. Separately stated invoice charges, while prerequisite to a claim of nontaxability, cannot be dispositive of the proper application of the sales tax to the transaction. A taxpayer cannot transform a properly taxable amount into a nontaxable amount through the simple expedient of a separately stated invoice charge.

Equipment, engineering, and installation combine in this instance to produce BellSouth's desired result: a functioning item of tangible personal property assembled on the customer's premises. Without engineering, this final product cannot be provided to the customer. As the Tennessee Supreme Court has observed:

> There is scarcely to be found any article susceptible to sale or rent that in not the result of an idea, genius, skill and labor applied to a physical substance. A loaf of bread is the result of the skill and labor of the cook who mixed the physical ingredients and applied heat at the temperature and consistency her judgment dictated. A radio is the result of the thought of a genius, or several such persons, combined with the skill and labor of trained technicians applied to a tangible mass of substance. An automobile is the result of all these elements, and of patents, etc.; and so on, ad infinitum. If these elements should be separated from the finished product and the sales tax applied only to the cost of the raw material, the sales tax act would, for all

practical purposes, be entirely destroyed. The material used in the making of a phonograph record probably costs only a few cents. The voice of a Caruso recorded thereon makes it sell for perhaps a dollar. To measure the sales tax only by the value of the physical material in this phonograph record is to apply an impossible formula.

*Crescent Amusement Co. v. Carson*, 187 Tenn. 112, 213 S.W.2d 27, 29 (1948).

To exempt the cost of engineering from sales tax in this case would be to apply the "impossible formula" warned against by the Supreme Court. The engineering services were in most instances essential to the installation of the equipment. Most of the switching equipment was sold "E, F, & I" – engineered, furnished, and installed. The engineering services in this case were an integral "part of the sale of tangible personal property," and thus were subject to sales tax.

**Conclusion**

The ruling that AT&T's sales of telephone central office power, transmission and switching equipment were not tax-exempt sales of industrial machinery, but were subject to sales tax, is affirmed.

The ruling that the engineering services performed by AT&T in conjunction with its sales of central office power, transmission and switching equipment were not subject to sales tax is reversed.

The ruling that the Chancery Court had subject matter jurisdiction over AT&T's claim for refund of taxes paid in 1990, 1991, 1992 and 1994 is reversed.

The case is remanded for (1) a determination of the amount of taxes owing by AT&T, (2) an award of attorney fees and expenses pursuant to Tenn. Code Ann. § 67-1-1803(d), and (3) for all other appropriate purposes.

Costs are assessed to AT&T.

PER CURIUM