**HARRY J. WHELCHEL COMPANY**

v.

**John K. KING, Commissioner of Department of Revenue for the State of Tennessee.**

Supreme Court of Tennessee.

Dec. 29, 1980.

Rehearing Denied Jan. 26, 1981.

Raymond R. Murphy, Jr., A. Alexander Taylor, II, Miller & Martin, Chattanooga, for plaintiff-appellee.

William M. Leech, Jr., Atty. Gen., Jimmy G. Creecy, Senior Asst. Atty. Gen., Nashville, for defendant-appellant.

## OPINION

FONES, Justice.

The question in this State revenue case is whether the grain bins that plaintiff sells to farmers qualify for the one percent sales tax rate applicable to "farm equipment and machinery" as defined in T.C.A. § 67–3002(p).

The trial judge found in favor of taxpayer and the Commissioner's appeal presents two issues, to wit: (1) whether the grain bins are used "directly and primarily" to produce agricultural products for sale, and (2) whether the grain bins become real property when erected or installed.

The statutory definition in effect for the taxable periods involved in this litigation reads as follows: [1]

> " 'Farm equipment and machinery' shall mean any appliance used directly and principally for the purpose of producing agricultural products for sale and use or consumption off the premises, the retail price of which, for any such single article, exceeds two hundred and fifty dollars ($250), but shall not include an automobile, truck, household appliances or property which becomes real property when erected or installed."

During the period of the audit, April 1, 1975, through March 31, 1978, plaintiff sold approximately eighty grain bins to Tennessee farmers. Plaintiff collected from the farmers and remitted to the State a one percent sales tax on each of those sales, relying upon the reduced rate provided in T.C.A. § 67–3003(h) for equipment and machinery used in the production of agricultural products for sale. As a result of the audit, plaintiff was required to pay sales tax at the full rate. The additional tax was paid under protest, and this suit was brought to recover the sum taxpayer asserts was erroneously assessed and collected.

## I.

The only proof offered by the Commissioner was the testimony of the employee who was in charge of the audit. He did not attempt to contradict any of the facts herein recited and they are therefore undisputed.

After erection on a purchaser's farm, a grain bin resembles a silo in outward appearance. The undisputed proof, however, was that the two are different in many respects. The agricultural products that a farmer puts in a silo are planted and harvested specifically for the purpose of making silage. The crop is harvested while still green, chopped up into small pieces by a silage harvesting machine, and stored in the silo for the purpose of fermentation. That process produces gases and juices that are highly corrosive to metal. Silos may be constructed of concrete, brick or metal, but if the outer structure is metal it is lined with a material that prevents the wet silage from having any contact with the metal. Silos are usually larger in diameter and height than grain bins and are usually permanently affixed to a concrete base. Because of the function it performs and the materials used, a silo is constructed on a farm with the intent and purpose that it be a permanent structure.

A grain bin is assembled on a farm like an erector set. The cylindrical body is formed by corrugated metal body sheets, and the roof is formed by pie shaped metal panels. The record contains a narrative description and movie of the procedure followed in the erection of an actual, typical grain bin, twenty-four feet in diameter and sixteen feet in height, to the eave, with a capacity of six thousand bushels. The evidence indicates that in the present case the body sheets and roof panels were loaded on

---

1. The Legislature added the following sentence to T.C.A. § 67–3002(p) by 1979 Public Acts, ch. 352, effective July 1, 1979: "Notwithstanding the foregoing provisions, grain bins and attachments thereto which are sold to or used by a farmer shall be considered 'farm equipment and machinery'."

a truck at the plaintiff's establishment in the reverse order of assembly and delivered to the farm. A simple concrete pad with six anchor bolts had been poured and cured by the farmer. The first eight body sheets were bolted together to form the first ring, and the roof panels were assembled on that ring; that ring and roof were jacked up by four hand-wound jacks and a second ring of eight sheets assembled under them. A total of six rings were assembled in like manner and a caulking compound was applied at each ring juncture to provide weather sealing. The metal ring body sheets were graduated in gauge from light at the top to heavy at the bottom. The typical installation was accomplished by one employee of the plaintiff and five persons who had no experience whatever in assembling a grain bin, employed by the farmer who purchased the materials from plaintiff. They began the installation at 8:30 a. m. and finished at 5:00 p. m., with a one hour break for lunch. The nuts and bolts operation was accomplished with electrically operated impact wrenches that fit over the hex head of the bolt on the outside of the ring, with a man on the inside holding the nut with pliers or a hand wrench.

Grain bins may be disassembled in reverse order at approximately sixty percent of the time and cost of the original assembly.

The basic and necessary materials are the metal sheets that are bolted together to form the rings and the metal panels that are bolted together to form the roof. Plaintiff also sells the other equipment, some of which is necessary to the proper operation of the grain bin and some of which is optional. Those "accessories," as they are referred to in the record, include fans, dryers, heaters, ladders and perforated metal flooring. The proof is not clear, but the implication is that a bin may rest upon the concrete base, or a perforated metal floor may be assembled and attached to the bottom ring, at the farmer's option.

The typical grain bin, erection of which was described in the record, was attached to the concrete base by the six anchor bolts.

Mr. Whelchel testified that the only reason for using the anchor bolts was to prevent the bin from being blown over in a high wind if it was empty; that when filled with grain there would be no necessity for the use of the anchor bolts.

Mr. Whelchel further testified that his company offered for sale, and sold, both smaller and larger bins than the twenty-four by eight foot bin described. A bin, small enough to be moved without disassembling, was allowed by the Commissioner to be taxed at the farm rate. It was anchored to a concrete base by a few nuts and bolts in the same manner as larger bins.

One of the witnesses who testified in the case was a grain farmer, who had leased land, purchased a grain bin from plaintiff, and erected the bin on the leasehold estate. He testified that upon the expiration of his lease he would definitely remove the grain bin from the leased land.

There was testimony that the agricultural stabilization and conservation service of the United States Department of Agriculture made loans on grain bins assembled on leased or owned farms; that it regarded them as personal removable property, and secured the loans on them by a promissory note and a UCC financing statement. There was also evidence of a number of foreclosure sales of grain bins following default on the loans made by the USDA.

Grain bins serve two functions for the farmer: to reduce the moisture content of the harvested crop and to provide safe storage until the market price is more favorable than it traditionally is at harvest time. The market price is based upon a specific moisture content. The price of soy beans, for example, is based upon thirteen percent moisture and the price declines one percent of the base price for each one-half percent of moisture in excess of thirteen percent. Soy beans are normally harvested at about eighteen percent moisture, which is an unsafe level for storage, and if sold at that time the farmer would be docked ten percent for its moisture content; in addition, the market price is historically at its lowest during the harvest season. Also, soy beans

would begin to rot in a few days if the moisture content was not reduced.

## II.

■ The Commissioner says a grain bin is not used directly and principally for the purpose of producing agricultural products for sale. The auditor testified, however, that the "accessories," fans, blowers, dryers, ladders, etc., were taxed at the farm rate. No explanation has been advanced below or in this Court by the Commissioner for making a distinction between the accessories attached to the grain bin and the metal sheets, roof panels, and nuts and bolts that, once assembled, constitute a grain bin. It is axiomatic that the "accessories" are absolutely useless to the farmer without the grain bin structure. The fans, blowers, dryers and ladders, etc., will not function effectively in the open air. Having conceded that the accessories are entitled to the farm rate, we think the Commissioner has conceded that the two-fold purpose of having a grain bin is a process used directly and principally in the production of agricultural products for sale. Unquestionably, the grain bin structure provides the necessary operating environment for the drying of the grain to make the crop marketable at an acceptable price and provides safe storage until such time as the farmer is not "at the mercy" of the grain buyers. One of the farmers testified that it would be economically impossible for him to raise corn and soy beans without grain bins.

■ In short, a farmer uses a grain bin to "produce" low moisture content grain for sale at the top market price and at a time selected by the farmer, as distinguished from producing a high moisture content grain that must be sold at harvest time, at a sacrificial price. We think a grain bin is directly and primarily used to produce grain for sale.

The Commissioner insists that *Woods v. General Oils, Inc.*, 558 S.W.2d 433 (Tenn. 1977) supports his position in this case. We disagree. General Oils blended oil of different weights and sulfur content to produce the industrial and heating oils that it marketed. The blending was accomplished by means of an "in-line proportioner" that drew oil from two or more storage tanks in the proper quantities to discharge into delivery trucks the weight and sulfur content required by the customer.

The Commissioner conceded that the "in-line proportioner" and its appurtenances were utilized directly and primarily in the processing of oil for resale, but denied that three larger tanks were entitled to the reduced tax rate. This Court found as a fact that the three tanks in controversy were used primarily for storage of oil prior to the beginning of processing it for delivery and, therefore, taxable at the full rate.

We think the "drying" process accomplished in a grain bin serves a comparable purpose for the farmer that the "in-line proportioner" served General Oils. The fact that the grain bin provides a simultaneous storage function does not negate its drying function, which qualifies as a process directly and principally involved in the production of agricultural products for sale. As we pointed out heretofore, the drying function cannot be accomplished without the grain bin structure.

## III.

The Commissioner insists that a grain bin becomes real property when erected or installed.

■ The applicable legal principles were collated by Justice McCanless in *Memphis Housing Authority v. Memphis Steam Laundry-Cleaner, Inc.*, 225 Tenn. 46, 463 S.W.2d 677 (1971), as follows:

"In *Hickman v. Booth*, 131 Tenn. 32, 173 S.W. 438, Mr. Justice Green said:

'In Tennessee only those chattels are fixtures which are so attached to the freehold that, from the intention of the parties and the uses to which they are put, they are presumed to be permanently annexed, or a removal thereof would cause serious injury to the freehold. *Johnson v. Patterson*, 13 Lea [81 Tenn.], 626; *De Graffenreid v. Scruggs*, 4 Humph. [23 Tenn.], 451, 40 Am.Dec. 658; *Union Bank & Trust Co. v. [Fred W.] Wolfe*, 114 Tenn. 255, 86 S.W., 310, 108 Am.St.Rep., 903, 4 Ann.Cas. 1070. The usual test is said to be the inten-

tion with which a chattel is connected with realty. If it is intended to be removable at the pleasure of the owner, it is not a fixture. *Johnson v. Patterson*, 13 Lea [81 Tenn.], 626; *Cannon v. Hare*, 1 Tenn.Ch., [22] 23.'

Chancellor Cooper in *Cannon v. Hare*, 1 Tenn.Ch. 22, which he decided in 1872, said:

'Accordingly the tendency of modern decisions is to make the rights of the parties to fixtures and buildings depend not on the manner in which they are affixed to the freehold, but upon the character of the parties, the intention in erecting the improvements, and the uses to which they are put.' " *Id.* at 679.

◼ The undisputed proof is that a grain bin can be disassembled and hauled away at less expense and in less time than was required to erect it in the first instance, and without "serious injury to the freehold." Only the concrete base would be left, and one of the witnesses testified that if a farmer desired the removal of the base it could be broken up by a bulldozer and hauled away in a matter of hours. It is clear that the metal sheets and panels from which a grain bin is assembled are not injured by assembly or disassembly and re-erection, and that it is more economical to disassemble and move and reassemble a used grain bin than to buy a new one.

The applicable regulation promulgated by the Commissioner of Revenue provides as follows:

"1320–5–1–1.11 FARM EQUIPMENT AND MACHINERY.

.     .     .     .     .

(4)(a) A farmer who buys farm equipment and machinery for the purpose of producing agricultural products for sale and who is entitled to the benefits of this rule shall establish his right to the reduced tax rate by submitting to the dealer a signed statement to the effect that the implement or appliance to be purchased will be used directly and principally for the purpose of producing agricultural products and that it will not become attached to realty."

Plaintiff had furnished the Commissioner with statements from all of the farmers to whom sales were made during the audit period, fully complying with that regulation and affirmatively stating that it was the intention of the farmers that the grain bin or bins would not become real property when erected on their respective farms.

The Commissioner asks this Court to disregard the stated intent of the farmers, which the regulation infers is sufficient to obtain the reduced rate, apply an objective test, and find a contrary intent from the type of structure, the mode of attachment, and the use and purpose of the farmer in purchasing the materials for a grain bin. We reach a result consistent with the farmers' stated intent upon applying those objective tests. We think all of those factors support the stated intention of the farmers that are involved here, that grain bins do not become real property when erected on a farm. These bins merely rest upon a concrete base, attached by a half dozen or less nuts and bolts that can be removed in minutes. The attachment is solely for the purpose of keeping the large cylindrical structures from blowing over in a high wind when empty and is not for the purpose of affixing them to the realty. Further, the proof that they are financed as personal property, sold at foreclosure for removal as personal property by the USDA, and installed by lessees on leased farms is convincing evidence that grain bins are universally regarded as removable personal property.

The judgment of the Chancery Court of Hamilton County is affirmed. Costs are adjudged against the Commissioner of Revenue.

BROCK, C. J., and COOPER, HARBISON and DROWOTA, JJ., concur.

OPINION ON PETITION TO REHEAR

FONES, Justice.

The petition to rehear is respectfully denied. *See City of Mason v. Banks*, 581 S.W.2d 621, 627–28 (Tenn.1979).

BROCK, C. J., and COOPER, HARBISON and DROWOTA, JJ.