# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### December 6, 2011 Session

## ROBERT KEENAN, SR., ET AL. v. BARRY C. FODOR, ET AL.

### Appeal from the Chancery Court for Cheatham County
### No. 14500     Robert E. Burch, Judge

### No. M2011-01475-COA-R3-CV - Filed July 30, 2012

This case arose from a dispute between neighbors over the ownership of an elaborate stone and metal gate used for entry into both their residential properties. The predecessors-in-interest of the defendants installed the gate at their own expense, placing it on an easement over the plaintiffs' adjoining lot. The plaintiffs decided to sell their house, and included a picture and a description of the gate in their real estate listing and advertisements. The defendants asserted that they owned the gate and compelled the plaintiffs' realtor to remove all mention of the gate from sales materials. The plaintiffs then filed a complaint to quiet title. After a bench trial, the court found that the gate belonged to the defendants and dismissed the plaintiffs' complaint. The plaintiffs argue on appeal that the trial court erred because the gate is a fixture and, thus, that it has become part of the plaintiffs' property by operation of law. We affirm the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Kristin J. Fecteau, Nashville, Tennessee, for the appellants, Robert Keenan, Sr. and Debra B. Keenan.

Tara L. Swafford, Lauren Cooney, Franklin, Tennessee, for the appellees, Barry C. Fodor and Deborah A. Fodor.

## OPINION

### I. A DISPUTED GATE

Robert and Deborah Keenan (the Keenans) owned three adjoining lots in Ashland City's Sycamore Valley subdivision, numbers 11, 12 and 13. Their home was on lot 11. Lot 12 was subject to a fifty foot recorded easement along its northern border that benefitted the owners of a home located on another lot that adjoined Lot 12, by giving them access to the main road, Sycamore Valley Drive. The street address of that adjoining lot was 75 Golf Club Lane. Michael and Debbie Rutherford (the Rutherfords) were the owners of the home at 75 Golf Club Lane when the events that led up to this case began.

In 1998, the Rutherfords told the Keenans that they wanted to build a gate on the lot 12 easement because of problems they were having with trespassers and vandals. The Keenans did not object.[1] The Rutherfords then designed, paid for, and built the elaborate structure that is the subject of this lawsuit. Debbie Rutherford testified that the total cost of building the gate was between $19,000 and $25,000.

The gate itself is made up of two ornamented wrought iron sections that swing open on hinges fixed to steel posts. The posts are attached to columns of concrete block that are faced with stone and flanked by two curved stone walls or wings. The span between the far ends of the two wings is about 32 feet. A portion of one of those wings extends outside the boundaries of lot 12, encroaching on the county right of way. Electrical and phone lines are connected to a call box at the gate, which can be opened remotely by hydraulic cylinders. The gate is illuminated by electric lights. The proof showed that the electric and phone bills have always been sent to the residents of 75 Golf Club Lane.

In 2003, Keenans built a new house on Lot 13 and sold their home on Lot 11. The street address of the new home was 25 Golf Club Lane. The Keenans asked the Rutherfords if they could use the gate for access to their new home, and with the agreement of the Rutherfords, they built a driveway from the gate to their home. The Rutherfords and the Keenans were apparently able to share the use of the gate without any problems. According to their testimony, they never expressly discussed the question of who owned the gate.

In April of 2006, Barry and Deborah Fodor (The Fodors) purchased the home at 75 Golf Club Lane from the Rutherfords. The record includes a sales brochure for the sale of

---

[1]The Keenans contend that the Rutherfords asked them for permission to build the gate on the easement, while Mr. Rutherford testified that he did not ask, but rather told Mr. Keenan that he intended to build the gate. In either case, the Keenans had the opportunity to object if they wished to, but did not do so.

the Rutherford Home which the Fodors testified they relied upon when they purchased it. The brochure included a photograph of the gate and a list of property features. One of the listed exterior features was a "custom stone and iron privacy gate." The brochure was drafted by the Rutherfords' realtor, and was printed by the Keenan Group, Inc., a firm operated by Debra Keenan.

For the first six or seven months after they moved in, the Fodors and the Keenans shared the use of the gate without any problems. The Keenans even asked the Fodors if they had any objections to a brick and aluminum fence that they planned to erect at the edges of lots 12 and 13 on either side of the gate. The Fodors agreed to the fence, but told the Keenans not to attach it to the gate, and the Keenans obliged.

However, a dispute arose between the parties in October of 2007. Debra Keenan decorated the gate with scarecrows and the gate began to malfunction shortly thereafter.[2] Barry Fodor told Robert Keenan that he needed to consult with the Fodors before putting any decorations on the gate. Debra Keenan subsequently called Deborah Fodor and told her that no consultation was needed, because the Keenans were the legal owners of the Gate.[3] Communications between the parties thereafter came to an end.

In November of 2009, the Keenans decided to sell their home at 25 Golf Club Lane. The MLS listing for the home included a photograph of the gate and a description that begins, "These beautiful custom stacked stone and iron gates welcome visitors and help keep out unwanted guests. . ." The same photograph of the gate was included in an advertisement printed under the letterhead of the Keenan Group.

After they saw the MLS listing, the Fodors retained an attorney. He sent a letter to the Keenans on November 23, 2009, stating that the Keenans were not entitled to represent to potential purchasers that they owned the gate and demanding that they remove any reference to the gate in their advertising by December 9, or "my clients will have no choice but to take action to make sure that any purchasers of your property are not given the wrong impression of who owns the gate." A copy of the letter was sent to the Keenans' realtor, who made the requested changes to the MLS listing. Debra Keenan did not change her advertisements.

---

[2]Robert Keenan acknowledged that the scarecrows caused the gate to malfunction. Barry Fodor testified that they blocked an electronic eye in the mechanism, causing the gate to open and close repeatedly, until a roller device in the system burned out.

[3]Debra Keenan testified that she obtained the legal advice that led her to believe that she and her husband owned the gate by presenting the facts to a Minnesota-based website called "Just Answer."

## II. COURT PROCEEDINGS

On December 21, 2009, the Keenans filed a Complaint to Quiet Title in the Chancery Court of Cheatham County, naming the Fodors as defendants. The Keenans claimed that because the gate is a permanent structure affixed to realty that they own, it must be considered a fixture to the realty and is therefore their property. They accordingly asked the court to remove the cloud on their title caused by the Fodors' claim of ownership. They also asked for damages in the amount of $75,000 for defamation of title and another $75,000 for tortious interference with economic advantage.

The Fodors filed an Answer on January 27, 2010. They asked for a declaratory judgment that they are the true owners of the gate. They also asserted several counter-claims against the Keenans, including claims for fraud and promissory estoppel, and they asked for $200,000 in damages. In the alternative, the Fodors asked for compensation for unjust enrichment in the event that the court should rule in favor of the Keenans on the issue of ownership. The Keenans filed a motion for summary judgment, which the trial court denied. The Keenans subsequently withdrew all their claims for money damages, other than attorney fees and court costs.

The court conducted two full days of hearings on May 12 and 13, 2011, and heard extensive testimony by the Keenans, the Rutherfords, and the Fodors. Other witnesses testified briefly, including the realtor who sold the Rutherford home to the Fodors, the Cheatham County property assessor, and a technician from the company that services the gate.

The accounts of the parties as to the communications between them were at odds in a few instances. For example, Deborah Fodor testified that prior to the scarecrow incident, Debra Keenan admitted that the gate belonged to the Fodors, but made a point of informing her that it was located on the Keenans' property. Debra Keenan denied that any such communication ever occurred.[4] For the most part, however, the testimony of the parties (and of the Rutherfords) was consistent on the salient facts.

---

[4]Deborah Fodor's specific testimony was that after they moved in, the Fodors invited the Keenans to a dinner party at the Fodor house. They discussed the road during the event, and Debra Keenan said, "by the way, do you know that the gate sits on my property? Deborah Fodor allegedly replied, "Are you saying the gate belongs to you?' and Debra Keenan responded, "No, I just want you to know that it sits on my property." But Debra Keenan denied ever making such a statement.

For example, it was undisputed that the Rutherfords designed and built the gate at their own expense, without any input from the Keenans. It was also undisputed that the Keenans did not object to the construction of the gate on the Lot 12 easement and that the Keenans used the gate after they moved to their new home on Lot 13. Debra Keenan even acknowledged that the existence of the gate provided a valuable security benefit to her and her husband. She testified, however, that she always believed that the Keenans owned the gate, but she never told the Rutherfords about her belief, because "I didn't think it was necessary."

The proof showed that first the Rutherfords, and then the Fodors, paid to have the gate insured. It was stipulated at trial that they also paid the phone and electric bills. The proof showed that the Rutherfords paid about $2,400 in phone and electric bills for the gate while they lived on the property, and the Fodors paid about $7,400. Debra Keenan testified that she and her husband paid $500 to install a direct connection between the call box and their home. She acknowledged that this feature was added strictly for their own convenience. At one point, the Keenans offered to share some of the costs for gate repair and maintenance with the Rutherfords. The proof showed that the Keenans did pay some of those expenses, in the amount of about $1,600.

The Fodors testified that when they bought the house at 75 Golf Club Lane from the Rutherfords, they believed that the gate was included in the sale. The Keenans' attorney elicited testimony from Mr. Fodor that the contract of sale does not explicitly mention the entrance gate. Mr. Fodor acknowledged that the contract and an addendum to it (referred to by the parties as a "personal property agreement") listed numerous items of personal property that were included in the sale and that the gate was not named in either document. A paragraph in the contract states, however, that "all information or items listed in the Multiple Listing Service are included in this contract, unless specifically excluded herein." The top of the first page of the MLS listing in question refers to a "stone gated entry," and the third page includes a photograph of the gate and a brief description.

Because of the legal questions involved in this case, some of the most important testimony involved Michael Rutherford's intentions when he built the gate. Mr. Rutherford testified that he had no intention at the time to ever move from his home and that he designed the gate to reflect his Scottish heritage, which was also expressed in the decor of his home. Two large gold Scottish lions, fabricated in metal are attached to the two wrought iron sections of the gate. The address of the home, 75 Golf Club Lane, and the name the Rutherfords gave to their property, "Hidden Valley," are inscribed in a stone plaque mortared into one of the wings flanking the gate. A favorite biblical quote of the Rutherfords is inscribed in a plaque embedded in the opposite wing: "As for me and my house, we will serve the Lord."

Mr. Rutherford also testified that he had the gate built so he could disassemble it and move it onto his own property in case any problems arose with the easement. One concern was the possibility that the county might finally decide to build a cul-de-sac on county-owned land that a portion of the gate sits upon. The plan for the proposed cul-de-sac was included in a registered plat for the Sycamore Valley Subdivision. Mr. Rutherford testified that he instructed his contractor to build the gate without a substantial foundation in case it had to be moved.

Consistent with that purpose, the granite caps on top of the two columns and the wings were not mortared, but were held in place by gravity alone and could be lifted up without damaging them. Several photos were introduced into evidence showing Mr. Fodor and a friend lifting up some of those caps. Mr. Rutherford also testified that a dry stone stacking technique was used on the columns and wings, requiring only a small amount of mortar at the back in order to keep the stones in place. The idea was to make it easy to take the walls down piece by piece, without damaging the expensive stones.

Mr. Rutherford's testimony was confirmed by the telephonic deposition of James Brown, the contractor who built the gate and who described his interactions with Mr. Rutherford over its design and construction.[5] Mr. Brown testified that Mr. Rutherford told him at the outset that the gate had to be built with a minimal foundation so that it could be moved if necessary. Mr. Brown objected, warning Mr. Rutherford that without a proper foundation, the wall and gate would eventually fall over and that a stable installation required pouring concrete footers into the ground at least three feet wide and sixteen inches deep.

According to Mr. Brown, Mr. Rutherford insisted that the foundation be done his way, but he agreed with Mr. Brown's suggestion that the wings be built in the shape of a curve instead of straight line, for greater stability.[6] Mr. Brown testified that in accordance with Mr. Rutherford's instructions, he used two by fours to frame up a four inch thick concrete pad on top of the ground, and built the wings on top of the pad. A dump truck load of dirt

---

[5]Mr. Keenan objected to the use of Mr. Brown's deposition at trial. The deposition of a party "may be used for any purpose if the court finds that the witness is 'unavailable' as defined by Tennessee Rule of Evidence 804(a)." That rule sets out a number of different circumstances that would constitute unavailability, including if the witness is "at a greater distance than 100 miles from the place of trial or hearing." Mr. Brown moved to Florida two years before his deposition was taken. The place of deposition, according to its cover sheet, was 1950 Harbor Point Drive, Merritt Island, Florida.

[6]Mr. Brown testified that when he was first contacted by Mr. Fodor's attorney, and was told that there was a pending matter involving the gate, he became frightened, because he thought that it had probably fallen over and that he was being sued.

was brought in and spread over the pad to cover it up. Mr. Brown also testified that he poured a somewhat sturdier footer or a foundation below ground under the columns attached to the steel posts that held up the gate. He stated that he used two by sixes to frame up the footer and that he reinforced the concrete with rebar. Mr. Brown also explained how the gate could be disassembled and removed if necessary.

Mr. Keenan challenged the testimony as to the depth of the foundation under the columns by testifying that he did some exploratory digging around the columns and that he found over two feet of concrete under them. Photographs of his excavation were entered into the record and show some sort of foundational structure extending at least two feet into the ground. Mr. Rutherford testified, however, that before he built the gate, there were already posts in place from an earlier gate on the property. He further testified that he and his son attempted to pull one of the posts out of the ground by hooking it to his truck, but that he could not move it. Mr. Brown testified that he removed some existing posts from the ground before building the gate.

At the conclusion of testimony and closing statements, the trial court announced its decision from the bench, which was memorialized in its Final Order and Judgment, filed on June 15, 2011. The court held that the gate was not a fixture but was personalty owned by the Fodors, because "it was constructed for the purpose of allowing it to be removed," and that the Fodors purchased it from the Rutherfords as part of their purchase of the house at 75 Golf Club Lane. The court further held that the Keenans were "equitably estopped to assert ownership of a gate they neither built nor paid for." The court accordingly entered judgment for the Fodors on their counterclaims for declaratory judgment as to ownership of the gate and for promissory estoppel, but dismissed their monetary claims. The Keenans' claims were all dismissed. This appeal followed.

### III. ANALYSIS

The issue in this case is the ownership of the gate. The case does not involve easement access or placement of the gate. Both parties agree that the issue of ownership is largely determined by whether the gate is correctly characterized as a fixture. The trial court held that the gate was not a fixture, but, instead, was personalty and was owned by the Fodors.

Our review on appeal of the trial court's findings of fact is *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001); *Hass v. Knighton,* 676 S.W.2d 554, 555 (Tenn. 1984). We review a trial court's conclusions of law *de novo*, with no presumption of correctness. *Whaley v.*

*Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993).

The question of whether the disputed gate is a fixture to the land is a mixed question of law and fact, so it is reviewed with no presumption of correctness. *State v. Thacker,* 164 S.W.3d 208, 248 (Tenn. 2005); *Aaron v. Aaron,* 909 S.W.2d 408, 410 (Tenn. 1995); *Foust v. Metcalf,* 338 S.W.3d 457 (Tenn. Ct. App. 2010); *Newman v. Woodard*, 288 S.W.3d 862, 865 (Tenn. Ct. App. 2008).

### A. Is the Gate a Fixture or Is It Personalty?

A simple definition of a fixture is "an article in the nature of personal property which has been so annexed to the realty that it is regarded as part of the land." Black's Law Dictionary (5th Ed.).   More nuanced definitions also exist:

> Fixtures have been defined as a species of property lying along the dividing line between real and personal property.  The term fixture necessarily implies something having a possible existence apart from realty, but which may, by annexation, be assimilated into realty.  It is generally used in reference to some originally personal chattel which has been actually or constructively attached either to the soil itself, or some structure which is legally part of the soil.

35A AM.JUR 2d *Fixtures* 839.

Since a fixture, by definition, has become part of the land to which it is attached, the owner of that land usually owns the fixture as well.  If, however, a disputed item is determined not to have become a fixture, but to have remained personal property, then the person who created it, paid for it, or purchased it is still the presumptive owner, entitled to remove it from the realty if he or she wishes to do so.[7]

The test for determining whether or not a particular item of property is a fixture was stated in *Hickman v. Booth,* 173 S.W. 438, 438 (Tenn. 1915):

> In Tennessee only those chattels are fixtures which are so attached to the freehold that, from the intention of the parties and the uses to which they are

---

[7]The Fodors contend that even if we were to find that the gate was a fixture, that would still not resolve the issue of its ownership, because while it is situated on land owned by the Keenans, it was built on the Fodor's easement, and thus they have a property right in the underlying realty.  We need not decide this issue, however, for we have determined that the gate is not a fixture.

put, they are presumed to be permanently annexed, or a removal thereof would cause serious injury to the freehold.  The **usual test is said to be the intention** with which a chattel is connected with realty. If it is intended to be removable at the pleasure of the owner, it is not a fixture.

*Hickman v. Booth,* 173 S.W. at 438 (citations omitted) (emphasis added).

The above passage indicates that when considering whether a chattel has become a fixture, the court must look to the manner and strength of its attachment to the realty, the difficulty and consequences of removing it, and the owner's intention at the time of attachment.  A number of cases stand for the proposition that the most important consideration of all is the intention of the parties and that the significance of the other factors comes principally from their role in supplying some sort of objective proof of the avowed intentions of the parties.

For example, the case of *ANR Pipeline Co. v. TN Board of Equalization*, Nos. M2001-01098-COA-R12-CV, M2001-01117-COA-R12-CV, M2001-01119-COA-R12-CV, 2002 WL 31840689 (Tenn. Ct. App. Dec. 19, 2002)(Rule 11 perm. app. denied June 30, 2003) involved thousands of miles of natural gas pipelines, laid across numerous easements on Tennessee land, and buried on gravel beds thirty inches below the soil.  This court found that the pipes did not become part of the land, because they could be, and sometimes were, removed, and because the parties did not intend the landowners to have any claim or ownership interest in the pipes.  We stated that,

It is now the generally recognized rule that the manner of annexing chattels to realty is not the controlling consideration in determining whether or not the chattels becomes a part of the realty. The question of the intention of the parties to a lease is generally held to be controlling in determining in doubtful cases whether or not a chattel annexed to realty becomes a part thereof and the property of the lessor.

*ANR Pipeline Co. v. TN Bd. of Equalization,* 2002 WL 31840689 at *3 (quoting *Dudzick v. Lewis,* 133 S.W.2d 496 (Tenn. 1939))

*Harry J. Whelchel Co. v. King*, 610 S.W.2d 710 (Tenn. 1980), involved a tax audit of a company that manufactured metal grain bins.  The question in that case was whether the bins became fixtures when they were installed on the farms of the manufacturer's customers, in which case they would be treated differently for tax purposes.  The bins were twenty-four feet in diameter and sixteen feet in height and were bolted to concrete pads.  The Supreme Court noted that the bins were assembled on site and could be disassembled and hauled away without damaging them, and that one witness testified that the concrete pads could be broken

up by a bulldozer "in a matter of hours" and likewise hauled away.

The court also noted that the farmers/owners had all furnished the Commissioner of Revenue with statements that "it was the intention of the farmers that the grain bin or bins would not become real property when erected on their respective farms." *Harry J. Whelchel Co. v. King*, 610 S.W.2d at 714. The court characterized the evidence as to the mode of attachment of the bins and their movability as an "objective test" of those intentions. Since the result of that test was consistent with the farmers' stated intent, the Supreme Court determined that the bins did not become fixtures when they were installed on the farms of the manufacturer's customers.

In *Magnavox Consumer Electronics v. King,* 707 S.W.2d 505 (Tenn. 1986), the Supreme Court discussed *Harry J. Whelchel Co. v. King,* but reached the opposite result. The property at issue was a 500,000 gallon fuel tank. The tank was not permanently affixed to the concrete pad on which it sat, but the court concluded nonetheless that it was a fixture, because "[i]ts sheer size, as evidenced from the exhibits, indicates that it was not intended to be 'removable at the pleasure of the owner'" *Magnavox Consumer Electronics v. King,* 707 S.W.2d at 507 (quoting *Hickman v. Booth,* supra).

*Hubbard v. Hardeman County,* 868 S.W.2d 656 (Tenn. Ct. App. 1993) involved a dispute between two banks as to the ownership of the proceeds from the sale of three large prefabricated buildings that were used as bank branch offices. One building was 14 feet wide and 40 feet long and weighed about 80,000 pounds. The other two were 14 feet wide and 30 feet long, and weighed about 60,000 pounds each. The buildings were placed on concrete pads, and were hooked up to electricity, alarm systems, plumbing and sewage. Driveways sidewalks, outside lighting, shrubs and parking were installed around them.

The purchaser of the buildings stated that he chose them because they were portable, and "can be moved as market conditions or needs change." The trial court heard conflicting testimony as to how much time, money, and effort was required to move them. The court held, however, that the expense of removal was not controlling in this case, for the ground leases expressly provided that the buildings were not to become fixtures. The court observed that "[t]he controlling test as to whether property connected with real estate is deemed to be realty or mere chattel, removable at the pleasure of the owner, is the intention and purpose of the erection." *Hubbard v. Hardeman County,* 868 S.W.2d at 660 (citing *Johnson v. Patterson,* 81 Tenn. 626 (1884)). The court accordingly ruled that the buildings were personalty, and not fixtures.

The cases we have cited (and many others we could have cited) all indicate that when personal property is affixed to the land, the courts must primarily look to the intention of the

parties to determine whether the property has become a fixture.[8]

In its ruling from the bench, the trial court declared that the gate "was constructed for the purpose of allowing it to be removed," and that "it was the obvious intent of both parties [the Rutherfords and the Fodors] to transfer the gates." The Keenans contend that the trial court erred by basing its decision solely on the testimony of the Rutherfords and the Fodors about their intentions. They argue that the court ignored the other factors that should go into such a determination: that is, the permanence of the gate's attachment to the realty, and the damage its removal would cause to the property.

The trial court's final order does not contain specific findings of fact about the construction of the gate or the process of removal. Where the trial court has not made a specific finding of fact on a particular matter, we review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn.1997); *Smith v. Tennessee Farmers Life Reassurance Co.*, 210 S.W.3d 584, 588 (Tenn. Ct. App. 2006); *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001).

Our examination of the record persuades us that the trial court's conclusions are amply supported by the evidence. The proof showed that the Rutherfords paid for the gate, and that they designed it to reflect Michael Rutherford's Scottish heritage. Further, they placed a plaque on it bearing the address of the Rutherford property and of no other. These are all indicators of intent. Mr. Rutherford testified that he had the gate built in such a way that it could be moved to his own property if necessary, because it was located partly on a private easement and partly on city-owned land, and he wanted to be prepared for any contingency.

The Rutherfords' contractor, Mr. Brown, recommended that a substantial footer be poured beneath the wings of the gate, and that the columns supporting the gate rest on an even more substantial foundation, dug deep into the ground. Mr. Rutherford nonetheless ordered Mr. Brown to build a slab above the ground to support the wings, and a shallower foundation under the columns than the contractor recommended. Mr. Brown objected because such construction made the gate less stable than it otherwise would have been, but Mr. Rutherford prevailed. The evidence thus not only includes testimony as to Mr. Rutherford's intent, but also of the motive behind that intent, and of acts taken in furtherance of its accomplishment.

---

[8]The Keenans rely on a Civil War Era case, *Childress v. Wright* 42 Tenn. 350 (1865), which, they state, involved "a factual situation which is, for all practical purposes, identical to the one this Honorable Court confronts." We find the facts of the cases, as well as the historical contexts, to be so different that the holding in *Childress* has no relevance here.

-11-

The Keenans dispute the evidence that the gate could be moved. They characterize it as a "huge, heavy, deeply anchored structure," and they suggest that any attempt to remove it would destroy it. They concede the possibility that the wings might be moveable, but they point to the evidence that there was a deeper footer beneath the columns than Mr. Brown testified to creating, and suggest that because of the depth of the footer beneath the columns, the gate itself was permanently fixed in place. The trial court was itself a bit perplexed about those footers. In its ruling from the bench, the court said,

> The question of the deeper footing under the columns is an entreating one[9] but not determinative. Really the only reasonable conclusion is that Mr. Brown's crew poured that concrete. I can't think of any other series of events that would come to some other conclusion. However, the deeper footing also may be removed without damage because all you have to do is fill up the hole. I'm guessing it was either done without Mr. Brown's direct supervision or that he did it and forgot about it. But that does not change its character.

The Keenans argue that removing the footers would leave "huge craters" that would require a lot of dirt to fill, which would then have to be compacted to restore the property to its former condition. Even if we accept the theory that Mr. Brown created the footers, and that they would have to be removed *in toto* to properly restore the property, our analysis remains the same: the Rutherfords built the gate with the intention that it remain their property, and they designed it so that it could be moved if necessary. If the difficulty and/or the cost of removing it and restoring the property on which it currently stands turns out to be somewhat greater than they anticipated, that does not *ipso facto* make it a fixture.

The Keenans also attack the credibility of the Rutherfords and of Mr. Brown. They suggest there was collusion between the Rutherfords and Mr. Brown prior to Mr. Brown's deposition, which caused him to testify as he did. They further assert that Mr. Rutherford had a motive not to tell the truth, because if the court were to rule in favor of the Keenans, the Fodors would have a possible cause of action against the Rutherfords for selling them a gate that was not rightfully theirs to sell.

Where the trial court has seen and heard the witnesses, however, its judgment regarding their credibility and the weight to be given their testimony is accorded considerable deference on appeal, because the trial judge is in a far better position to observe the demeanor of witnesses than is the appeals court. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Fell v. Rambo*, 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000).

---

[9]The court presumably said "intriguing," and the court reporter erred in the transcription.

-12-

In this case, the trial court had the opportunity to hear the testimony of the Rutherfords, the Keenans, and the Fodors and to assess their credibility. Because Mr. Brown testified by deposition, we are in the same position as was the trial court to assess his credibility, and we are entitled to draw our own conclusions as to the weight and credibility of his testimony. *Krick v. City of Lawrenceburg*, 945 S.W.2d 709, 712 (Tenn. 1997).

We note that the Keenans' attorney had the opportunity to cross-examine Mr. Brown closely, and that despite the contractor's nervousness, his testimony remained detailed, consistent and plausible. Further, his testimony was consistent with the testimony of Michael Rutherford, and the trial court's decision indicates that it found Mr. Rutherford to be a credible witness. We find no basis to disagree.

In sum, the evidence preponderates in favor of the court's finding that the Rutherfords did not intend to allow the gate to become a fixture on the Keenans' realty and that it was included in the sale of their home to the Fodors. The trial court therefore did not err in declaring that the Keenans' claim was without merit and that the Fodors are the true owners of the gate.

## B. Equitable Estoppel

In its ruling from the bench, the trial court articulated an alternate reason for upholding the Fodors' claim to ownership of the gate. The court stated that under the circumstances of this case, it "would shock the conscience of the court," to award the gate to the Keenans, and it asserted that the Keenans "are equitably estopped to assert ownership of gates they neither built nor paid for."

Equitable estoppel is a legal doctrine founded on concepts of equity and fair dealing. It prevents a party from asserting a legal claim or defense which is contrary to or inconsistent with his prior action or conduct. 28 AM.JUR 2d *Estoppel and Waiver* § 40. The doctrine is described in *Church of Christ v. McDonald,* 171 S.W.2d 817 (Tenn. 1943), as follows:

> Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

*Church of Christ v. McDonald,* 171 S.W.2d at 821.

Equitable estoppel may arise not only from written or spoken words or from deeds, but also from the silence of one who is under a duty to speak or an omission to act by one who has a duty to act. *Burks v. Elevation Outdoor Advertising*, LLC, 220 S.W.3d 478, 491 (Tenn. Ct. App. 2006); *Douglass v. Rowland,* 540 S.W.2d 252, 254 (Tenn. Ct. App. 1976) (citing *Duke v. Hopper*, 486 S.W.2d 744, 748 (Tenn. Ct. App. 1972)). As our Supreme Court has stated,

> We think there is no principle more firmly embedded in equity than that, where an owner stands by and sees another erect valuable structures upon his property in the belief that he is upon his own land, the owner is estopped from asserting any claim resulting from or arising out of the transaction.

*LaRue v. Greene County Bank,* 166 S.W.2d 1044, 1050 (Tenn. 1942).

If there was an estoppel in this case, it arose from the failure of the Keenans to say or do something to assert an ownership interest in the gate in a timely manner.

It is undisputed that the Keenans did not claim ownership of the gate until nine years after it was built. The Keenans permitted the Rutherfords to build the gate and to pay insurance on it, as well as the electrical and phone bills incident to its operation, although the Keenans did pay some maintenance costs after they began using the gate. Over the years, the Keenans acknowledged several times that the Rutherfords owned the gate.

When the Rutherfords decided to sell their house, they prepared a brochure that highlighted the gate as one of its features. Debra Keenan saw a draft of the brochure, but did not raise any objection to its content, and her company printed it. After the home was sold, the Fodors carried the same burden of payment of insurance and the electric and phone bills. Gary Fodor also took responsibility for required maintenance on the gate systems, including performing some or the repairs himself (he is an electrical engineer) and even the replacement of the lights bulbs that illuminated the gate when they burned out.

In short, the conduct of the Rutherfords and the Fodors was consistent with the belief that they were the owners of the gate. The Keenans behaved in a manner consistent with a belief that the gate belonged to their neighbors. The Keenans argue, however, that equitable estoppel does not apply in this case because one of its required elements has not been proven: that the party seeking to invoke the equitable estoppel must have acted to his detriment in reliance upon the statement or conduct of the parties against whom it is to be enforced.

But it appears to us that the Fodors acted to their detriment by assuming the physical and financial responsibility for the gate, in reliance on the belief that they were its owners,

a belief which the Keenans did not challenge until after the scarecrow incident. Thus, we agree with the trial court that equitable estoppel constitutes an alternative ground for holding that the gate belongs to the Fodors.

**IV.**

The judgment of the trial court is affirmed.  We remand this case to the Chancery Court of Cheatham County for any further proceedings necessary.  Tax the costs on appeal to the appellants, Robert and Debra Keenan.


_____
PATRICIA J. COTTRELL, JUDGE